# 14-1471

## In the United States Court of Appeals
### for the Second Circuit

———

Adar Investment Fund, Ltd., *Plaintiff-Appellant*,
Todd Augenbaum, Individually and On Behalf of All Others Similarly Situated, *Plaintiffs*,
Ralph Holl, individually and on behalf of all others similarly situated, Todd Augenbaum, Individually and On Behalf of All Others Similarly Situated, *Consolidated – Plaintiffs*,

v.

Forest Oil Corporation, David M. Anderson, Michael N. Kennedy, H. Craig Clark, Patrick R. McDonald, Loyola G. Keough, David M. Fitzpatrick, H. Clayton Peterson, J.P. Morgan Securities LLC, Credit Suisse Securities (USA) LLC, and TD Securities (USA) LLC, *Defendants-Appellees*,
Lone Pine Resources, Inc., *Defendant.*

**On Appeal from the United States District Court
for the Southern District of New York (New York City)**

———

### BRIEF AND SPECIAL APPENDIX OF PLAINTIFF-APPELLANT

———

Stanley D. Bernstein
Michael S. Bigin
Joseph R. Seidman, Jr.
BERNSTEIN LIEBHARD LLP
10 East 40th Street, 22nd Floor
New York, NY 10016
(212) 779-1414
bernstein@bernlieb.com
bigin@bernlieb.com
seidman@bernlieb.com

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

CORPORATE DISCLOSURE STATEMENT ...................................... vi

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF ISSUES ..................................................................... 2

STATEMENT OF THE FACTS AND CASE ......................................... 3

    A.    The Rainbow Pipeline Ruptures and Closes on April 29, 2011 .......... 4

    B.    Defendants Failed to Disclose the Pipeline Closure in the IPO Prospectus on May 26, 2011 ................................................. 5

    C.    Four Months After Netting $183 Million in Lone Pine's IPO, Defendants Reveal a Pipeline Closure That Increased Transportation Costs by as Much as 31% of 2Q11 Profits .................. 6

    D.    The Securities Class Action ................................................. 8

SUMMARY OF ARGUMENT .............................................................. 10

ARGUMENT ......................................................................................... 10

I.      STANDARD OF REVIEW ......................................................... 10

II.     SECTION 11 OF THE SECURITIES ACT ................................. 11

III.    PLAINTIFF SATISFIES THE SECOND CIRCUIT'S STANDARDS FOR PLEADING ACTIONABLE STATEMENTS UNDER SECTION 11 OF THE SECURITIES ACT ................................. 12

    A.    The Pipeline Closure And Its Expected Effect On Lone Pine Were Material Facts Omitted From The IPO Prospectus ................. 13

           1.    The Pipeline Closure and its Effect on Lone Pine's Business Was Quantitatively Material ...................... 14

i

2. The IPO Prospectus Omitted Qualitatively Material Facts ......16

B. Defendants Had an Affirmative Legal Duty to Disclose the Pipeline Closure Pursuant to Item 303 of Regulation S-K ................20

C. Corporate Actors Are Liable For Literally True But Misleading Statements ........................................................................27

D. Defendants Had a Duty to Disclose the Facts About the Pipeline Rupture Because They Put the Issue "In Play" .................................29

CONCLUSION ................................................................................32

# TABLE OF AUTHORITIES

## CASES

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)............................................................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................11

*Berger v. Apple REIT Ten, Inc.*,
2014 WL 1613281 (2d Cir. Apr. 23, 2014)........................................10

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
No. 12-1776-cv, 2012 WL 6621391 (2d Cir. Dec. 20, 2012) ..........................13

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002) ...................................................29

*City of Pontiac Policemen's and Firemen's Retirement Sys.*,
2014 WL 1778041 (2d Cir. May 6, 2014).........................................11

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ................................................13, 15

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...........................................27

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) .........................................14, 15, 16, 31

*Goldman v. Belden*,
754 F.2d 1059 (2d Cir. 1985) ................................................14, 31

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)............................................................11

*Hutchinson v. Deutsche Bank Sec. Inc.*,
647 F. 3d 479 (2d Cir. 2000) .......................................12, 13, 16, 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
618 F. Supp. 2d 311 (S.D.N.Y. 2009) ...........................................27

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ..............................................................................13

*In re Prudential Secs. Inc. P'ships. Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996) ...............................................................30, 31

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...............................................................30

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ......................................................................*passim*

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ............................................................................30

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011).............................................................................13, 16

*McKenna v. SMART Techs. Inc.*,
  No. 11 Civ. 7673 (KBF), 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012).......29, 30

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990) .............................................................................27

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013) ...............................................................10, 14, 31

*New Orleans Employees Retirement Sys. v. Celestica, Inc.*,
  455 F. App'x. 10 (2d Cir. 2011) .......................................................................15

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010) ...............................................................................27

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012) .....................................................................*passim*

*SEC v. Gabelli*,
  653 F.3d 49(2d Cir. 2011),
  *rev'd on other grounds*, 133 S. Ct. 1216 (2013)................................................27

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) .............................................................................29

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)................................................................12

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013)............................................20, 21, 25, 26

*Staff Accounting Bulletin No. 99*,
    1999 WL 1123073 (Aug. 12, 1999)...............................16, 17, 18, 19

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976).............................................................................14

*Wilson v.* Merrill *Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011) .............................................................27

## **STATUTES**

15 U.S.C. § 77 ........................................................................................1

15 U.S.C. § 77k(a) ...............................................................................11

15 U.S.C. § 77z-1 ...............................................................................1, 9

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

## **RULES & REGULATIONS**

F.R.A.P. 32(a) .....................................................................................33

Fed. R. App. P. 32(a) ........................................................................33

Fed. R. Civ. P. 12(b)(6)..................................................................1, 10

17 C.F.R. § 229.303(a).....................................................................20, 23

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant ADAR Investment Fund, Ltd. ("Appellant" or "Lead Plaintiff" or "ADAR") is a corporate party within the meaning of Rule 26.1 of the Federal Rules of Appellate Procedure.  Lead Plaintiff has no parent company and there is no publicly-held corporation owning 10% or more of Appellant's stock.

# JURISDICTIONAL STATEMENT

Appellant appeals from the ruling by Judge George B. Daniels of the United States District Court for the Southern District of New York (the "District Court"), which, pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissed Appellant's Amended Class Action Complaint (the "Complaint") for not adequately pleading that the alleged misrepresentations and omissions in the Complaint were material to investors. A-20.[1]

The District Court's subject matter jurisdiction for this action rests on 15 U.S.C. § 77z-1 and 28 U.S.C. § 1331. The Complaint alleged claims under Sections 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77.[2]

This Court's jurisdiction rests on 28 U.S.C. § 1291. The District Court entered a Judgment, as well as a Memorandum and Order (the "Order"), which disposed of Appellant's claims, on March 27, 2014. SA-1. On April 28, 2014, Appellant timely filed its Notice of Appeal from the dismissal and Judgment. A-375.

---

[1] References to "A-__" and "SA-_" are to pages within the Joint Appendix and Special Appendix, respectively, submitted herewith.

[2] As noted below, Appellant is not appealing the dismissal of the Section 12 claims. *See infra* at 9 n. 3.

## <u>STATEMENT OF ISSUES</u>

1.      Whether Defendants violated Section 11 of the Securities Act by omitting from the IPO Prospectus (defined below) that the pipeline largely relied on by the Company (the Rainbow Pipeline) to deliver its oil to market ruptured and remained closed since a month before the IPO and would remain closed for an indefinite period while under environmental review for suspected systemic issues, and that the pipeline closure had, and would continue to, negatively affect Lone Pine's operations by causing the Company to incur increased transportation costs up to ten times more than incurred in the quarter prior to the IPO in order to truck the oil to market.

2.      Whether Defendants violated Section 11 of the Securities Act by omitting material information required by Regulation S-K of SEC Rule 303 (a)(3)(ii) because the pipeline closure's effect on Lone Pine was a "known trend[] or uncertainty[]" that Defendants reasonably would have expected to have a material unfavorable impact on net sales or revenues or income from continuing operations, and/or which caused a material change in the relationship between costs and revenues thereby requiring disclosure in the IPO Prospectus.

3.      Whether Defendants violated Section 11 of the Securities Act by omitting the negative effects of the closure of the Rainbow Pipeline when telling investors "we have installed infrastructure that allows us to transport by pipeline

2

the majority of our oil production, which has minimized the cost of trucking" and stating "[i]f we experience interruptions or loss of pipelines or access to gathering systems that impact a substantial amount of our production, it could have a material adverse effect on our business, financial condition, cash flows, and results of operations."

4.    Whether Forrest Oil, which was the parent company of Lone Pine prior to the IPO and held a majority of shares in Lone Pine post-IPO, violated Section 15 of the Securities Act as a control person of Lone Pine.

## STATEMENT OF THE FACTS AND CASE

Lone Pine Resources, Inc. ("Lone Pine" or the "Company") is a Canadian oil and gas company with four significant gas and oil properties.  A-27 (¶ 34). Although three of the Company's properties produced natural gas, the Evi Area in Northern Alberta, Canada was Lone Pine's "primary oil development resource play."  A-28 (¶ 38).  Indeed, the Evi Area contained approximately 24% of all Lone Pine's total gas and oil estimated proved reserves.  A-65 (Paradise Decl. Ex. A at IPO Prospectus 2).  Moreover, oil revenue accounted for approximately 33% of Lone Pine's total net revenue for the first quarter 2011.  A-28 (¶ 39).

The Evi Area also had nearly all the Company's proved undeveloped drilling locations for expansion, possessing 101 of the 139 sites.  A-65 (Paradise Decl. Ex. A at IPO Prospectus 2).  Lone Pine advised investors that the Evi Area was a

"significant development opportunity for premium-priced light oil" (A-27-28) (¶ 37) and that the Evi Area showed promise of increasing production by adding more wells in the short term.   A-28 (¶ 40).   The Evi Area was particularly important because the price of oil had increased almost 20% year over year, in stark contrast to the falling price of natural gas.  A-28 (¶ 42).

### A.      The Rainbow Pipeline Ruptures and Closes on April 29, 2011

Alberta, Canada is "criss-crossed by thousands of kilometers of oil and natural gas pipe." A-30 (¶ 48).  On April 29, 2011, the Rainbow Pipeline operated by Plains Midstream Canada ruptured, causing Alberta's worst oil spill in thirty-six years.   A-29  (¶ 44).    The Rainbow Pipeline was immediately shut down indefinitely pending a review by the Energy Resources Conservation Board ("ERCB").  A-29 (¶¶ 44, 46).  The Rainbow Pipeline leak was the second of two pipeline breaks in less than two weeks.  A-30 (¶ 47).  The frequency of the pipeline failures concerned officials that Alberta's aging pipeline system may have been experiencing systemic problems.   A-30-31 (¶¶ 48-50).   As a result, the ERCB advised that "it [would] take a cautious approach" and closed the Rainbow Pipeline indefinitely pending its investigation into whether the leak was "evidence of a systemic problem with the line."  A-31 (¶ 51).  It was uncertain when or even if the ERCB would reopen the pipeline as "public opinion [was] increasingly turning against pipelines."  A-31-32 (¶¶ 53, 55).  Indeed, the *Globe and Mail* reported that

4

the ERCB "said it will take a cautious approach to authorizing the pipeline's reopening." A-31 (¶ 51). The ERCB did not allow the pipeline to reopen until almost five months after the rupture, in August, 2011. A-37 (¶ 84).

Oil companies, such as Lone Pine, who used this pipeline lost access to inexpensive transportation of oil to market at approximately $1-$2 per barrel and faced the prospect of either shutting down oil production, continuing to pump oil at full or reduced capacity and storing the oil, or paying "major increases in transportation costs" to truck the oil to market. A-31 (¶¶ 51-52). The *Calgary Herald* noted that the Rainbow Pipeline break "created uncertainty and hurt output among companies that rely on the line, because they have almost no pipe alternatives to transport crude…" A-31 (¶ 52). Thus, producers attempted trucking oil at a cost of $7 to $10 a barrel more than using the pipeline. Further, "[t]rucking…create[d] problems beyond cost. When storage fill[s] up, companies must shut down wells until the next truck comes by to empty the tanks." *Id*.

**B.    Defendants Failed to Disclose the Pipeline Closure in the IPO Prospectus on May 26, 2011**

On May 26, 2011, Lone Pine spun-off from Forest Oil and commenced its IPO. A-32 (¶ 57). Lone Pine issued its Registration Statement and Prospectus incorporated therein (collectively, the "IPO Prospectus"), and began selling 15,000,000 shares of its common stock for $13.00 per share. A-32 (¶¶ 57, 59-60).

5

The IPO raised $195 million, with $183.3 million going to Lone Pine and $11.7 million to the underwriters.  A-32 (¶ 60).

The IPO Prospectus highlighted the Evi Area's infrastructure that delivered oil to markets stating, "[a]t the Evi Area, we have installed infrastructure that allows us to transport by pipeline the majority of our oil production, which has minimized the cost of trucking and the downtime associated with weather-dependent access to some locations."  A-33 (¶ 64).  The IPO Prospectus failed to disclose that the Rainbow Pipeline was closed indefinitely pending an ERCB review (A-33) (¶ 65), and that using trucks rather than the pipeline to transport oil materially increased transportation costs.  *Id.*

The IPO Prospectus also failed to disclose the closed pipeline when advising investors that "[i]f we experience interruptions or loss of pipelines or access to gathering systems that impact a substantial amount of our production, it could have a material adverse effect on our business, financial condition, cash flows, and results of operations."  A-33 (¶ 66).

### C.    Four Months After Receiving Almost $200 Million in Lone Pine's IPO, Defendants Reveal a Pipeline Closure That Increased Transportation Costs by as Much as 31% of 2Q11 Profits

On August 2, 2011, Lone Pine issued a press release announcing its financial results for the second quarter 2011 ("2Q2011"), for the period ending June 30, 2011.  The Company admitted that the oil price differential in 2Q2011 was

6

"negatively affected by a sales pipeline disruption in the Evi Area in late April that required volumes to be trucked to market."  A-35 (¶ 73).

During the earnings conference call held later that day, Lone Pine provided additional details concerning the sales pipeline disruption and its effect on the oil price differential and realized oil price at the Evi Area.  Defendant Anderson stated:

> In late April, the major oil sales pipeline in the [Evi] area had ruptured and has been out of service ever since.  Lone Pine has been trucking oil volumes to a sales point and is happy to report we've not seen any major disruption of volumes or restricted access to services at that time.  *The cost of our trucking of our oil volumes, however, has increased by an average of $7 to $10 per barrel depending on the length of the trip, and this has negatively affected our margins in the area,* . . .  (Emphasis added).

Defendant Anderson also admitted that, although the rupture occurred four months prior, the pipeline was still closed:  "We expect the pipeline to be back in service by this fall."  A-35 (¶ 74).

The Company provided detail on these increased costs.  Lone Pine reported that the average realized oil price paid for Lone Pine oil averaged $92.78 per barrel of oil of which $7 to $10 (or approximately 8%-10%) of the realized oil price was the result of the increased cost of trucking oil from the Evi Area as a result of the pipeline closure.  A-35-36 (¶ 75).  The additional trucking costs of $1.75 million to $2.5 million (*see* A-36 ) (¶ 79) represented a substantial portion – up to 31% – of Lone Pine's net second quarter 2011 earnings of approximately $8 million (*see* A-

357) (Paradise Decl. Ex. H at 9); between approximately 7% and 10% of Lone Pine's oil revenues; and approximately 3% and 5% of total revenues for 2Q2011. A-36 (¶ 81). The 2Q11 results also included positive statements touting the 100% drilling success rate in the Evi Area. A-36 (¶ 82). Following the Company's 2Q2011 earnings release and conference, the price of Lone Pine common stock declined almost 30% over the next several days, closing at $9.21 per share on August 11, 2011. A-37 (¶ 83).

Lone Pine subsequently fired Defendants CEO Anderson and CFO Bereznicki on February 27, 2013. *See* A-51 (Bigin Decl. Ex. 2 at 2). The Company commenced bankruptcy proceedings on September 25, 2013.

### D.    The Securities Class Action

On May 25, 2012, the first legal complaint was filed against Defendants. On that date, the price of Lone Pine stock closed at $3.32 – down almost 75% from the Company's $13.00 IPO price. A-40 (¶ 99). The action was brought on behalf of a class of persons who purchased or otherwise acquired Lone Pine common stock in connection with the IPO Prospectus. Lead Plaintiff is the Appellant in the action. Defendants are David M. Anderson, Michael N. Kennedy, H. Craig Clark, Patrick R. McDonald, David M. Fitzpatrick, Loyola G. Keough, H. Clayton Peterson,

8

Forest Oil Corporation, and underwriters J.P. Morgan Securities LLC, Credit Suisse Securities LLC, and TD Securities LLC.[3]

On September 4, 2012, ADAR filed a motion to be appointed as Lead Plaintiff pursuant to 15 U.S.C. § 77z-1(a)(3)(A)(i)(II) of the Private Securities Litigation Reform Act of 1995.  Among other lead plaintiff movants was institutional investor Twin City Pipe Trades Pension Trust.  A-11.  On November 16, 2012, the District Court appointed ADAR as Lead Plaintiff.  A-14.

Lead Plaintiff continued its investigation and filed the Complaint on January 10, 2013, alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act. A-20.  On March 22, 2013, Defendants moved to dismiss the Complaint.  After the motions were fully briefed and argued, on March 27, 2014, Judge Daniels issued the Order granting Defendants' motions to dismiss, holding that Appellant had not identified any material misstatements or omissions.  SA-2.  The District Court also issued a Judgment and ordered the Clerk of the Court to close the case.  SA-13.

_____

[3] Lone Pine concluded bankruptcy proceedings on January 10, 2014, and was voluntarily dismissed from this appeal.  The bankruptcy plan of Lone Pine was sanctioned by an Order of the Court of Queen's Bench of Alberta dated January 9, 2014 (the "Sanction Order"), which Sanction Order was then recognized by the United States Bankruptcy Court for the District of Delaware by an Order dated January 10, 2014.  All outstanding Lone Pine shares were cancelled by the bankruptcy, with no compensation returned to Lone Pine shareholders.  As noted above, Appellant is not appealing dismissal of its Section 12 claims because rescission, which is the remedy under Section 12 of the Securities Act that does not overlap with Section 11 statutory damages here, is no longer available to Plaintiffs.

Appellant timely filed its notice of appeal on April 28, 2014.  A-375.

## SUMMARY OF ARGUMENT

Under the Securities Act, Defendants are strictly liable for material omissions from the IPO Prospectus, including omissions of information required by SEC rules.

Any reasonable investor would have viewed the following facts as material: the pipeline Lone Pine relied on to transport its oil ruptured and closed a month before the IPO; the ERCB believed there could be systemic problems with the aging pipeline, which it closed indefinitely while investigating; and the closure negatively affected Lone Pine's operations by increasing transportation costs and cannibalizing earnings.

Accordingly, Appellant seeks reversal of the lower court's findings.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court applies a *de novo* review to a district court's dismissal of a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.,* 709 F.3d 109, 119 (2d Cir. 2013).  In so doing, it accepts as true all factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor.  *Berger v. Apple REIT Ten, Inc.*, 2014 WL 1613281, at *1 (2d Cir. April 23, 2014).  A complaint may not

be dismissed so long as it alleges facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

## II.   SECTION 11 OF THE SECURITIES ACT

Congress enacted Section 11 of the Securities Act with a low pleading burden in order to protect investors purchasing securities that have not been publicly traded before.  Section 11 provides:

> In case any part of [a] registration statement ... omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such…omission) may ... sue—(1) every person who signed the registration statement; (2) every person who was a director of ... or partner in the issuer at the time of the filing[;] ... [and] (5) every underwriter with respect to such security.

15 U.S.C. § 77k(a).  Thus, Appellant need only plead an omission of material fact to hold Defendants liable under Section 11.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381(1983).   "Plaintiffs need not allege scienter, reliance, or causation." *City of Pontiac Policemen's and Firemen's Retirement Sys.*, 2014 WL 1778041, at *5 (2d Cir. May 6, 2014).

The Supreme Court has explained that "Section 11 of the 1933 Act … was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering…. Liability is absolute, even for innocent misstatements." *Huddleston*, 459 U.S. at 381-82.  *See also Panther Partners Inc. v. Ikanos*

11

*Commuc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) ("Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters, '[i]n case any part of the registration statement…omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"). (Citation omitted).  Indeed, "[t]he need for issuers to disclose material information is crucial in the context of a public offering, where investors typically must rely . . . on an offering price determined by the issuer and/or the underwriters of the offering . . . ."  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1208 (1st Cir. 1996). "Accordingly, the disclosure requirements associated with a stock offering are more stringent than, for example, the regular periodic disclosures . . . [of a company]."  *Id.*

## III.   PLAINTIFF SATISFIES THE SECOND CIRCUIT'S STANDARDS FOR PLEADING ACTIONABLE STATEMENTS UNDER SECTION 11 OF THE SECURITIES ACT

An omission from a prospectus incorporated into a registration statement is actionable under Section 11 if the plaintiff pleads the omission is "a material omission in contravention of an affirmative legal disclosure obligation; or…a material omission of information that is necessary to prevent existing disclosures from being misleading."  *Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479,

12

484 (2d Cir. 2000). Lead Plaintiff has pled material omissions under both *Hutchison* factors.[4]

### A. The Pipeline Closure and Its Expected Effect on Lone Pine Were Material Facts Omitted From the IPO Prospectus

An omission is material if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted)). It is well settled that "materiality is a mixed question of law and fact." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, No. 12-1776-cv, 2012 WL 6621391, at *3 (2d Cir. Dec. 20, 2012); *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). Therefore, this Circuit has held that materiality "will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). In fact, "[b]ecause questions of materiality are 'inherently fact-specific,' . . . 'a complaint may not properly be dismissed . . . on the ground that the alleged…omissions are not material unless they are so obviously

---

[4] *Hutchison* also lists a third factor for a statement to be actionable under Section 11, namely, adequately pleading a material misrepresentation, which is not tested through this appeal. *Id.*, 647 F. 3d at 484.

unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *N.J. Carpenters*, 709 F.3d at 126 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154.162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059,1067 (2d Cir. 1985)).[5]

Here, the pipeline closure and its expected negative effect on Lone Pine were facts known to management that were important to investors.  *See* A-34 (¶ 68) ("Defendants' omission from the Prospectus that Lone Pine's Evi area fields used the Rainbow Pipeline to transport oil to market, which was closed indefinitely pending environmental review, would have significantly altered the total mix of information available to investors when deciding whether to purchase Lone Pine common stock.")  Accordingly, the pipeline closure and its effects were material and required disclosure in the IPO Prospectus.

### 1.    The Pipeline Closure and its Effect on Lone Pine's Business Was Quantitatively Material

While the Second Circuit has rejected a bright-line quantitative materiality test (*Ganino*, 228 F.3d at 162), omitting facts impacting financial metrics above

---

[5] *See also Litwin v. Blackstone Grp.*, 634 F.3d 706, 717 (2d Cir. 2011) ("even at the summary judgment stage, the 'determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact'") (citing *TSC Indus., Inc. v. Northway*, *Inc.*, 426 U.S. 438, 450 (1976)).

5% is still presumptively material.  *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 205; *Ganino*, 228 F.3d at 162.

Here, Defendants' omissions relating to increased transportation costs caused by the pipeline closure implicate numerous quantitatively material metrics above 5% – indeed, rising to as high as 31%.  As noted above, the increased 2Q11 transportation costs of $1.75 million to $2.5 million (*see* A-36) (¶79) amounted to a material percentage – up to 31% – of Lone Pine's 2Q11 net earnings of approximately $8 million.  *See* A-357 (Paradise Decl. Ex. H at 9).  And, critically, at the time of the IPO, the second quarter was one-third over and the pipeline had been closed for one month.  Accordingly, Defendants had every reason to know that the increased transportation costs stemming from the closure would be material.

The fact that increased transportation costs substantially ate into net earnings – by up to 31% – is particularly significant.  The Second Circuit has held that "earnings…are among the pieces of data that investors find most relevant to their investment decisions."  *New Orleans Employees Retirement Sys. v. Celestica, Inc.*, 455 F. App'x. 10, at *16 (2d Cir. 2011) (citing *Ganino*, 228 F.3d at 164).

Defendants also hid from investors that a material part of the business – 33% – now incurred costs up to ten times more than usually incurred to transport the oil

15

by pipeline.[6]  Further, in relation to the percentage of Lone Pine's revenue, the Complaint calculates the costs to be approximately 7-10% of Lone Pine's oil revenues, and 3-5% of total Company revenues, for the first quarter.  A-36 (¶ 81).  The Complaint also supports a finding that the trucking costs were negating 8%-10% of the realized oil price for 2Q2011 (A-35) (¶ 75) and 9-13% of realized oil price for 3Q2011 (A-38) (¶ 89).

In these circumstances, it cannot be said that "no reasonable investor" would find important the fact that the Rainbow Pipeline had closed, increasing transportation costs and adversely affecting revenues and earnings.  *Matrixx Initiatives*, 131 S. Ct. at 1311-12 .

### 2.    The IPO Prospectus Omitted Qualitatively Material Facts

The Second Circuit looks beyond mere quantitative measurements when determining the materiality of alleged omissions.  *See*, *e.g.*, *Hutchison*, 647 F.3d at 485 (the Second Circuit has "consistently rejected a formulaic approach to assessing [] materiality").  In *Ganino*, 228 F.3d at 164, the Second Circuit looked to the SEC's *Staff Accounting Bulletin No. 99*, 1999 WL 1123073, at *3 (Aug. 12, 1999) ("SAB 99") to evaluate materiality.  SAB 99 cites a number of additional qualitative considerations that support a finding of materiality even if the omitted

---

[6] Oil revenue accounted for approximately 33% of Lone Pine's total net revenue for the first quarter 2011 (A-28) (¶ 39).

16

information arguably did not have a large financial impact. For example, a fact is likely material if it "arises from an item capable of precise measurement" or is predictable. *Id.* Here, the closure of the Rainbow Pipeline caused Lone Pine to truck oil to market at a known cost of seven to ten dollars per barrel over the cost to send the oil down the pipeline. The fact that the additional cost could be precisely disclosed at the time of the IPO weighs in favor of materiality. *See* A-30-31 (¶¶ 49, 52).

Moreover, Defendants were well aware that, before Lone Pine's May 26, 2011 IPO, the re-opening of the Rainbow Pipeline was profoundly uncertain and, indeed, out of the Company's control. On May 4, 2011, three weeks before the IPO and one week after the rupture and closure, *The Globe and Mail* reported an article entitled "Costs for oil companies pile up after spill." A-30 (¶ 49). The article stated:

> Oil companies are shutting down wells and facing major increases in transportation costs as they load crude on trucks to work around a major spill that has stirred health concerns in a small Alberta community and closed the northern stretches of an important pipeline.
>
> The province's energy regulator is warning that it will not authorize a restart of the Rainbow pipeline, which sprang another substantial leak five years ago, until it is satisfied the line is not plagued with systemic problems.

*Id. The Globe and Mail* further reported that Canada's regulator, the ERCB, "said it will take a cautious approach to authorizing the pipeline's reopening. 'Our staff

17

have to determine if it's a one-time thing that happened there or if it's evidence of a systemic problem with the line,' spokesman Davis Sheremata said.  'Until they're convinced that it's not, they are not going to give the okay to restart operations.'"  A-31 (¶ 51).  *The Globe and Mail* article noted that the Rainbow Pipeline break and the ERCB review "*has created uncertainty* and hurt output among companies that rely on the line, because they have almost no pipe alternatives to transport crude out of a series of important light-oil plays in northern Alberta and the Northwest Territories."  A-31 (¶ 52).  (Emphasis added).  The uncertainty surrounding reopening the Rainbow Pipeline was a qualitatively material fact requiring disclosure.

Additionally, if an omitted fact hides a change in earnings or other trends it is likely material despite the amount.  SAB 99, 1999 WL 1123073, at *3.  Because Evi Area oil was previously sent down the Rainbow Pipeline, investors were unaware that trends and earnings were disrupted by a change in transportation costs due to its closure.  The pipeline closure also concealed a drag on income in the form of increased costs to transport the oil.  *See id*.  Moreover, omitting the pipeline rupture and the additional transportation costs also affected investors' ability to model and project earnings because prior period transportation costs were lower before the rupture.  *See id*.

18

SAB 99 also considers the financial impact on the company. The Complaint alleges that the increase in costs incurred to transport oil were material. The costs to truck oil to market were now seven to ten times more costly than the $1 per barrel cost to use the pipeline, which exceeds any presumptive 5% threshold mentioned in SAB 99. SAB 99, 1999 WL 1123073, at *3.[7]

Further, the importance of the Evi Area to the Company also militates in favor of a materiality finding. The Evi Area was Lone Pine's "primary oil development resource play." A-28 (¶ 38). The area contained approximately 24% of all Lone Pine's total gas and oil estimated proved reserves (*see infra* at 3). A-65 (Paradise Decl. Ex. A at IPO Prospectus 2). The area also had nearly all the Company's proved undeveloped drilling locations for expansion, possessing 101 of the 139 sites. Lone Pine advised investors that the Evi Area was a "significant development opportunity for premium-priced light oil" (A-28) (¶ 37) and that the Evi Area showed promise of increasing production by adding more wells in the short term. A-28 (¶ 40). The Evi Area was particularly important because the price of oil had increased almost 20% year over year, in stark contrast to the falling price of natural gas. A-28 (¶ 42). *Litwin*, 634 F.3d at 720 ("a particularly

---

[7] The fact that Lone Pine's revenues rose from the first to second quarters of 2011 is irrelevant. What is important is that the Company's revenues and earnings were materially less than they would have been if the undisclosed closure had not increased transportation costs.

important segment" of company's business, even if small relative to overall firm, is

material).

Accordingly, Defendants' omissions were qualitatively material and should

have been disclosed to Lone Pine investors.

### B.    Defendants Had an Affirmative Legal Duty to Disclose the Pipeline Closure Pursuant to Item 303 of Regulation S-K

"One of the potential bases for liability under §§ 11 and 12(a)(2) is an

omission in contravention of an affirmative legal disclosure obligation" like that in

Item 303.  *Panther Partners*, 681 F.3d at 120.  *See also Hutchison*, 647 F.3d at

485.  At subsection (a)(3)(ii) of Item 303, the SEC directed that registrants in an

IPO must:

> Describe any known trends or uncertainties . . . that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

*Id.  See also Panther Partners*, 681 F.3d at 120.[8]

---

[8] The SEC's Item 303 of Regulation S-K mandates, *inter alia*, that corporate directors and executives disclose known uncertainties that are "reasonably likely to affect operations" when selling stock in an initial public offering.  17 C.F.R. § 229.303(a).  *See also Silverstrand Invs. v. AMAG Pharms., Inc*., 707 F.3d 95, 102 (1st Cir. 2013) ("Item 303 imposes upon registrants of securities a series of disclosure duties 'intended to give the investor an opportunity to look at the company through the eyes of management,' so that they may 'assess the financial

This Court has consistently found that failures to disclose known uncertainties violate the requirements of Item 303 in analogous circumstances. In *Litwin*, 634 F.3d at 716, investors sued Blackstone, an asset management company, under the Securities Act for omitting information from a registration statement relating to "known uncertainties" in the real estate market. Blackstone's real estate investments accounted for approximately 22.6% of its assets under management. The Second Circuit held that plaintiffs adequately alleged that Blackstone was required by Item 303 to disclose uncertainty concerning the real estate market, which was "already known and existing at the time of the IPO," because it "was reasonably likely to have a material impact on Blackstone's financial condition." *See id.* at 719. Reversing the district court's dismissal of the complaint, this Court held:

> [T]he key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known [] uncertainty might have been reasonably expected to materially affect Blackstone's investments.... Again, the focus of plaintiffs' claims is the required disclosures under Item 303—plaintiffs are not seeking the disclosure of the ... downward trend in the real estate market.... **Rather, plaintiffs claim that Blackstone was required to disclose the manner in which th[at] then-known … uncertaint[y] might reasonably be expected to materially impact Blackstone's future revenues**.

*Id.* at 718-19 (emphasis added).

_____

condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.'") (Citation omitted).

21

When the pipeline would reopen fully or partially, if at all, was clearly a "known uncertainty" that would "reasonably be expected to materially impact on [Lone Pine's] net sales or revenues or income from continuing operations." *Id.* at 716. Indeed, as belatedly disclosed in August, 2011, the rupture caused increased transportation costs amounting to up to 31% of Lone Pine's net earnings for the second quarter of 2011. *See supra* at 7-8. Additionally, approximately 10% of realized oil prices received by Lone Pine was lost as a result of the increase in transportation costs caused by using trucks instead of the pipeline. A-35-36 (¶ 75). The pipeline continued to adversely impact realized oil prices received by Lone Pine in the third quarter of 2011. *See* A-39 (¶ 93) ("additional trucking costs of $7 to $10 per barrel increased the Company's costs by approximately $1,652,000 to $2,360,000 for 3Q2011").

Further, at the time of the IPO, the second quarter was one-third over and the pipeline had been closed for one month. Thus, Defendants were on notice that the increased transportation costs would materially, adversely affect Lone Pine's operations. Indeed, since the second quarter was one-third over at the time the IPO, trucking costs had likely *already* negatively affected Lone Pine earnings by up to over 10% (or a third of 31%). Finally, as discussed above, the pipeline closure was also material for several other reasons, both quantitative and qualitative. *See supra* at 14-20.

As discussed above, Defendants knew it was "uncertain[]" whether the Rainbow Pipeline would ever reopen because the ERCB closed the pipeline pending the results of its investigation into whether there were systemic problems with the pipeline. *See*, *e.g.*, A-33 (¶ 65) ("the Rainbow Pipeline was closed indefinitely while under environmental review and possible systemic problems were investigated"). Defendants violated their duties under Regulation S-K by failing to disclose these "known uncertainties" to investors. *See* Regulation S-K, 17 C.F.R. § 229.303(a); *see also supra* at 17-18, 22.

*Panther Partners*, 681 F.3d at 120, is also instructive. In *Panther Partners*, the defendant company developed and marketed programmable semiconductors. *Id.* at 116. Appellant alleged that defendants committed securities violations under the Securities Act in connection with a March 2006 secondary stock offering by failing to disclose, *inter alia*, that prior to the offering, defendant Ikanos was experiencing high defect rates and complaints relating to its chips, particularly from its two biggest customers, Sumitomo Electric and NEC. *Id.*, at 119. The district court dismissed plaintiffs' complaint because they had not alleged "'additional facts that Ikanos knew that the defect rate was above average before [making misleading statements in]…the [March 2006] registration statement.'" *Id.*

23

The Second Circuit reversed the dismissal, holding that defendants had concealed a "known trend or uncertainty" under Item 303 that Defendants reasonably expected would adversely affect company revenues:

> We hold that the [plaintiffs] plausibly allege[] that the defect issue, and its potential impact on Ikanos's business, **constituted a known trend or uncertainty that Ikanos reasonably expected would have a material unfavorable impact on revenues or income from continuing operations.**
>
> It is true that, as alleged, Ikanos did not recall and undertake to replace all the chip sets until June 2006. Nor was the precise 25-30% chip failure rate determined until after the [start of the class period at the time of the] Secondary Offering. But neither of these facts undermines the plausible inference that, at a time when it was receiving an increasing number of calls from these customers and its Board of Directors was discussing the issue, **Ikanos was aware of the "uncertainty" that it might have to accept returns of a substantial volume, if not all, of the chips it had delivered to its major customers. It goes without saying that such "known uncertainties" could materially impact revenues.**

*Id.* at 121-122 (emphasis added).  As with the defect issue in *Panther Partners*, Defendants here were "aware of the 'uncertainty'" that the pipeline closure issue here "would have a material unfavorable impact on revenues or income from continuing operations".  *Id.* at 121.  And Defendants knew at the time of the IPO that the closure would likely have such an unfavorable impact on income as the quarter was one-third over and the pipeline had been already been closed for one

24

month.  *See supra* at 7, 15 (increased costs adversely affected Lone Pine's 2Q11

net earnings by up to 31%).[9]

Another recent Appeals Court decision supports Lead Plaintiff's arguments

concerning Item 303.  In *Silverstrand*, 707 F.3d 95, the district court dismissed

plaintiffs' claim that defendant AMAG – a drug company that marketed Feraheme,

a drug for treating kidney disease – had violated Section 11, *inter alia*, by failing to

disclose under Item 303 that it had received 23 serious adverse event ("SAE")

reports at the time of its public offering.  The district court held that AMAG did

not have to disclose the SAE's because they were mathematically "'consistent with

the previously ... publicly-disclosed rates observed in the clinical trials.'"  *Id*. at

104.  The First Circuit disagreed:

> [O]ur analysis under Item[] 303…cannot be limited to simple
> arithmetical computations. The question is not whether the 23 SAEs
> comported with past experiences but rather whether the 23 SAEs, in
> the context in which they occurred, created uncertainties or risks that
> AMAG needed to disclose under Items 303…. [Thus], the statistical
> comparison Defendants advance, even if it worked in their favor, is
> not dispositive. Rather, at this stage, we are more concerned with the
> allegation that, when the Offering took place, the news that Feraheme

---

[9] Arguments that Lone Pine did not expect a material impact because the pipeline
had been repaired at the time of the IPO and that other pipelines had reopened
shortly after ruptures fail to account for the fact that, notwithstanding the repair,
the pipeline remained closed until August 2011, and that this rupture occurred on
the Rainbow Pipeline, not elsewhere.  There, the ERCB stated that it needed to
examine the line for systemic problems, particularly because of concerns over the
pipeline's age, as well as the fact that other older pipelines were rupturing.  *See
supra* at 17-18.

had possibly caused a death, as well as the other serious side effects reported in the 23 SAEs, was already circulating within the medical community AMAG needed to win over to remain as a going concern. Because the Complaint alleged that AMAG failed to disclose the 23 SAEs, even though it knew about them, we cannot conclude that it failed to state plausible § 11 claims for omissions of Item 303 uncertainties….

*Id.* at 105-106. Likewise, here, Defendants' failure to disclose the pipeline closure "cannot be limited to simple arithmetical computations" concerning the level of increased transportation costs. *Id.* Rather, as in *AMAG*, this Court should be "more concerned with the allegation that, when [Lone Pine's IPO] took place, the news that [an important pipeline utilized by Lone Pine had closed]" was not disclosed.

Defendants knew from a month before the IPO that the pipeline closure caused transportation costs to increase up to ten times more than paid in the first quarter of 2011. Defendants were experiencing these higher costs for a month prior to the IPO, which had a known, material, adverse impact on earnings of over 10% at the time of the IPO. *See supra* at 22. Defendants also knew the pipeline might never reopen because of its age and that the ERCB suspected systemic problems, which were under investigation at the time of the IPO. A-30, 31, 33 (¶¶ 49, 51, 65). In these circumstances, Defendants should "reasonably should have expected" that the impact of the pipeline closure would increase

transportation costs and negatively affect Lone Pine's operations – which it clearly did.

Thus, Defendants were required to disclose this information to investors pursuant to Item 303(a)(3)(ii).

### C.    Corporate Actors Are Liable For Literally True But Misleading Statements

It is well-settled in this Circuit that "'half-truths—literally true statements that create a materially misleading impression—[] support claims for securities fraud.'"  *Wilson v. Merrill Lynch & Co*., 671 F.3d 120, 130 (2d Cir. 2011) (citing *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011)), *rev'd on other grounds*, 133 S. Ct. 1216,  (2013).  *See also Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F. 3d 86, 92 (2d Cir. 2010) ("[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."); *McMahan & Co. v. Wherehouse Entm't, Inc*., 900 F.2d 576, 579 (2d Cir. 1990) (literally accurate statements can, "through their context and manner of presentation, [become] devices which mislead investors.").  *Cf. In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 320 (S.D.N.Y. 2009) (courts find a violation of Section 11 when "material facts have been omitted or presented in such a way as to obscure or distort their significance"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) ("'[O]nce corporate officers undertake to make statements, they

27

are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading'") (citation omitted).

Defendants stated that "we have installed infrastructure that allows us to transport by pipeline the majority of our oil production, which has minimized the cost of trucking and the downtime associated with weather-dependent access to some locations."  A-33 (¶ 64).  Even if literally true, Defendants omitted critical facts from this statement; namely, that the Rainbow Pipeline was closed and increased transportation costs; and that the pipeline was closed indefinitely pending the ERCB's investigation.

Notwithstanding this well-settled line of cases, the District Court essentially held that if a statement is literally true, it cannot be misleading:  "[T]he Complaint does not allege any facts that establish that Lone Pine did not install this infrastructure or that at the time of the IPO, the temporary disruption of the pipeline was expected to prevent Lone Pine from continuing to transport a majority of its production by pipeline."  SA-6 (Order at 6).   But whether Lone Pine installed the infrastructure in question, or whether Lone Pine could still transport the majority of its production on its property by pipeline, are beside the point.  The point is that Defendants' omissions were misleading because Defendants did not disclose that the benefits of the Company's infrastructure had been cut off by a pipeline closure, which led to an eminently foreseeable increase in transportation

28

costs that amounted to a large portion – up to 31% – of Lone Pine's 2Q11 net earnings.

### D. Defendants Had a Duty to Disclose the Facts About the Pipeline Rupture Because They Put the Issue "In Play"

The fact that Defendants discussed transportation costs and infrastructure at all also shows those issues were material.  Indeed, by putting the issues of transportation costs and infrastructure "in play," Defendants had a duty to speak completely and truthfully about the pipeline closure and resulting increase in transportation costs because they chose to open the door and make representations about such issues.  *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not . . . a defense to . . . liability because upon choosing to speak, one must speak truthfully about material issues. Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete.").  As articulated by the Third Circuit:

> [W]here a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play."  For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," *the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations . . .   By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.*

29

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (emphasis added).[10]

Defendants did not speak completely and truthfully about the Company's infrastructure and transportation costs. *See supra* at 14-20. Indeed, Defendants warned of a *possible* pipeline closure when the Rainbow Pipeline was *already* closed at the time of the IPO. *See* A-33-34 (¶ 66) ("If we experience interruptions or loss of pipelines or access to gathering systems that impact a substantial amount of our production, it could have a material adverse effect on our business, financial condition, cash flows, and results of operations"). In other words, defying their legal obligations, Defendants chose to conceal the Rainbow Pipeline closure – possibly to ensure the success of the Company's IPO. After opening the door and speaking about possible pipeline closures, Defendants had a duty to speak completely and truthfully. They did not, and as a result, Defendants materially misled Lone Pine investors.[11]

---

[10] *See also McKenna v. SMART Techs. Inc.*, No. 11 Civ. 7673 (KBF), 2012 WL 1131935, at *13 (S.D.N.Y. Apr. 3, 2012) ("SMART's touting its expectation that the NextWindow acquisition 'will accelerate our ability to expand into the market for interactive touch products other than interactive whiteboards,'. . . put the question of such expansion – and NextWindow's contribution to that expansion – 'in play' such that SMART was required to make full disclosures to ensure the accuracy of the Offering Documents") (citation omitted); *Lapin v. Goldman Sachs Grp., Inc*., 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (if the defendant "puts the topic of the cause of its financial success at issue," it has a duty to disclose information concerning that topic).

[11] It is also axiomatic that "'[t]o warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable

30

Under these circumstances, the facts about the indefinite closure of the pipeline and the adverse effect of the closure on transportation costs cannot have been "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *N.J. Carpenters*, 709 F.3d at 126 (citing *Ganino*, 228 F.3d at 162 (quoting *Goldman*, 754 F.2d at 1067)).

Accordingly, Defendants were required to disclose such facts to investors in the IPO Prospectus.

---

events to happen when they have already occurred is deceit.'" *Lormand v. US Unwired, Inc*., 565 F.3d 228, 249 (5th Cir. 2009) (citation omitted). That is precisely what Defendants did here – warn of an existing problem as a possible contingency. *See supra* at 30. As Judge Pollack famously held, corporate executives cannot insulate themselves from liability with misleading statements about risk: "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Secs. Inc. P'ships Litig*., 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

## CONCLUSION

For the reasons set forth herein, the District Court's Order dismissing the Complaint should be reversed.[12]

Dated:  June 17, 2014

**BERNSTEIN LIEBHARD LLP**

/s/ Michael S. Bigin
Stanley D. Bernstein
Michael S. Bigin
Joseph R. Seidman, Jr.
10 East 40th Street
New York, New York  10016
Tel:  (212) 779-1414

**Lead Counsel for Plaintiff-Appellant
and the Putative Class**

---

[12] Because Lead Plaintiff adequately alleges claims under Section 11, its claims under Section 15 against Forrest Oil should also be reinstated.  Forrest Oil was a control person of Lone Pine.  A-45 (¶¶ 126-128).  The District Court's sole reason for dismissing the Section 15 claims was lack of an underlying violation.  *See* SA-10-11 (Order at 10-11).

32

Certificate of Compliance Pursuant to F.R.A.P.32(a)

Certificate of Compliance With Type Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) in that it contains 7,646 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     The attached opening brief complies with the typeface requirements
of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
32(a)(6) in that it is proportionately spaced typeface *Times New Roman* using 14
point type by the Microsoft Word program.

**BERNSTEIN LIEBHARD LLP**

/s/ Michael S. Bigin
Stanley D. Bernstein
Michael S. Bigin
Joseph R. Seidman, Jr.
10 East 40th Street
New York, New York  10016
Tel:  (212) 779-1414

**Lead Counsel for Plaintiff-Appellant
and the Putative Class**

33

# CERTIFICATE OF SERVICE

**CAPTION**: *Adar Investment Fund, LTD., Todd Augenbaum, Individually and On Behalf of All Others Similarly Situated, Ralph Holl, individually and on behalf of all others similarly situated, Todd Augenbaum, Individually and On Behalf of All Others Similarly Situated v. Forest Oil Corporation, David M. Anderson, Michael N. Kennedy, H. Craig Clark, Patrick R. McDonald, Loyola G. Keough, David M. Fitzpatrick, H. Clayton Peterson, J.P. Morgan Securities LLC, Credit Suisse Securities (USA) LLC, TD Securities (USA) LLC, Lone Pine Resources, Inc.*

**DOCKET NUMBER**: 14-1471

      I, Michael S. Bigin, hereby certify under penalty of perjury that on June 17, 2014, I served a copy of the Brief and Special Appendix of Plaintiff-Appellant by

       ___ United States Mail
       ___ Third Party
       ___ Overnight Mail
       ___ Facsimile
       ___ E-mail
       ___ Hand delivery
       _X_ CM/ECF

on the following parties:

Steven Paradise
Cliff Thau
VINSON & ELKINS LLP
666 5th Avenue, 26th Floor
New York, NY 10103
(212) 237-0000
sparadise@velaw.com
cthau@velaw.com

Peter E. Kazanoff
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-3525
pkazanoff@stblaw.com

June 17, 2014
Today's Date

/s/ Michael S. Bigin
Signature

34

**SPECIAL APPENDIX**

## CASE NO. 14-1471

## INDEX TO DOCUMENT REFERENCES IN SPECIAL APPENDIX

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Memorandum Decision and Order** (03/27/2014) ................................................ | **73** | **SPA-1** |
| **Judgment** (03/31/2014) ................................................ | **74** | **SPA-13** |

i

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 27 2014
```

IN RE LONE PINE RESOURCES, INC.

MEMORANDUM DECISION
AND ORDER

12 Civ. 4839 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiff ADAR Investment Fund, Ltd. alleges claims against Defendants under Sections 11 and 15 of the Securities Act of 1933 based on Defendants' purported failure to disclose the rupture of a pipeline used to transport a portion of its oil production, at the time of its initial public offering ("IPO"). Plaintiff also alleges claims under Section 12(a)(2) of the Securities Act against the Underwriter Defendants, who Plaintiff claims purchased Defendants' registered common stock and sold them to Plaintiff and class members. Before the Court are Defendants' and Underwriter Defendants' motions[1] to dismiss the complaint for failure to state a claim upon which relief may be granted under Rule 12(b)(6). Because Plaintiff fails to allege facts showing

---

[1] Defendants Lone Pine Resources, Inc., Forest Oil Corporation, David M. Anderson, Michael N. Kennedy, H. Craig Clark, Patrick R. McDonald, David M. Fitzpatrick, Loyoal G. Keough and H. Clayton Peterson's Motion to Dismiss (ECF 57) and Defendants J.P. Morgan Securities, LLC, Credit Suisse Securities (USA) LLC and TD Securities (USA) LLC's (the "Underwriter Defendants") Motion to Dismiss (ECF 60).

that Lone Pine made a material misstatement or omission about the impact of the pipeline
disruption on the company's IPO, Defendants' Motions are GRANTED.

## BACKGROUND

Lone Pine is "an independent oil and gas exploration, development, and production
company" with operations in Canada. (Am. Compl. ¶ 34). Lone Pine's IPO took place on May
26, 2011. Lone Pine filed its Final Prospectus on the same day. (Am. Compl. ¶¶ 1, 57).
Lone Pine's fiscal year ends on December 31. (*See* Paradise Decl. Ex. A at 14). Lone Pine has "a
well-balanced portfolio of oil and gas properties, consisting of low-risk natural gas and premium
priced light oil resource plays, as well as significant undeveloped potential associated with two
shale gas plays;" those properties include holdings in the Evi area in Alberta, Canada. (Paradise
Decl. Ex. A at 2). Lone Pine's IPO Prospectus disclosed that approximately 24% of Lone Pine's
estimated proved reserves as of December 31, 2010 were attributed to its Evi light oil property.
(Paradise Decl. Ex. A at 2).

On April 29, 2011, four weeks before the IPO, Plains Midstream Canada ("Plains"), the
owner and operator of the Rainbow Pipeline in Alberta, which Lone Pine used to deliver to
market the majority of the crude oil it produced in the Evi area, announced "a release of crude oil
along a remote section of the Rainbow Pipeline, in the Evi area" and temporary closure of the
pipeline. (Am. Compl. ¶ 44). On May 3, 2011, Plains was approved to resume partial operation
(the southern segment) of the Rainbow Pipeline. Plains explained that it had completed
"physical pipeline repairs" and that restarting the line would require regulatory approval.
(Exhibit C to the Paradise Decl.)

On August 2, 2011, Lone Pine issued a press release announcing its financial results for
the second quarter 2011, for the period ending June 30, 2011. It noted that while the oil price

2

**SPA-2**

differential realized in 2Q2011 had increased 15% compared to the first quarter 2011

("1Q2011"), it was "negatively affected by a sales pipeline disruption in the Evi area in late

April that required volumes to be trucked to market." (Am. Compl. ¶ 73). Lone Pine announced

that the increased cost to truck some of its oil production to market had a negative impact on the

price Lone Pine received for oil produced in that area. Accordingly, additional trucking costs of

$7 to $10 per barrel increased the Company's costs by approximately $1,750,000 to $2,500,000

for 2Q2011. (Am. Compl. ¶ 79). The 2Q2011 results also reported average daily net sales

volumes of oil increased to 2,846 barrels per day from 1,711 barrels per day in 1Q2011. (Am.

Compl. ¶ 77). In 2Q2011, oil net revenues accounted for $24,000,000 of the Company's total

2Q2011 revenue of $51,200,000 or approximately 47% of total revenues. (Am. Compl. ¶ 80).

Following the Company's 2Q2011 earnings release and conference call, the price of Lone Pine

common stock declined over the next several days, closing at $9.21 per share on August 11,

2011, a decline of approximately 29%, or $3.79, from the Company's IPO price of $13.00 per

share, on trading volume of 297,000.[2]  (Am. Compl. ¶ 83).

On August 16, 2011, the Energy Resources Conservation Board (ERCB) granted

conditional approval to Plains to resume operations of the Rainbow Pipeline. (Ex. F to Paradise

Decl.). On August 26, 2011, after Plains had satisfied the ERCB's conditions, Plains announced

that it had received approval to restart the northern segment of the pipeline and that Plains would

resume full service on August 30, 2011. (Exhibit G to Paradise Decl.).

Lead Plaintiff ADAR Investment Fund, Ltd. ("Plaintiff") brought suit under Sections 11

and 15 of the Securities Act of 1933 (the "'33 Act") based on Defendants' failure to disclose in

---

[2] On August 2, 2011, the day of the disclosure, Lone Pine's stock price closed at $11.84, one
cent more than the previous day's close.

3

its registration statement at the time of Lone Pine's initial public offering ("IPO") on May 26,

that the Rainbow Pipeline had ruptured.  Plaintiffs allege that the ruptured pipeline "negatively

affected" Lone Pine by temporarily decreasing the price that Lone Pine received for some of its

oil.

## I.    Fed. R. Civ. P. 12(b)(6) Pleading Standards

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "A claim has facial plausibility where the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  The court must accept all well-pleaded factual allegations in the complaint as true, and draw

all reasonable inferences in the plaintiff's favor.  *Chambers v. Time Warner, Inc.*, 282 F. 3d 147,

152 (2d Cir. 2002).  "The complaint may be dismissed only where 'it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"

*Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995); *Allen v. WestPoint–*

*Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78

S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)); *see also Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir.

2000).

## II.    Plaintiffs Fail to Plead a Section 11 Claim

"Section 11 of the Securities Act provides a private right of action to a person who

purchased a security . . . if the registration statement filed with the SEC contained either

misstatements or omissions of material facts." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d

479, 484 (citing 15 U.S.C. §77*k*(a)). Plaintiff must plead facts sufficient to establish "one of the

4

**SPA-4**

three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Id.* (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F. 3d 347, 360 (2d Cir. 2010)). Furthermore, plaintiff must, "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." *Lin*, 574 F. Supp. 2d at 421; *see also Charter Twp. of Clinton Police and Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08 Civ. 7062 (PAC), 2010 WL 4642554, at *11 (S.D.N.Y. Nov. 17, 2010) (accord).

### A. Plaintiffs Do Not Allege a Material Misrepresentation

Plaintiff alleges that the following are material misstatements in the Prospectus: (1) "[a]t the Evi area, we have installed infrastructure that allows us to transport by pipeline the majority of our oil production, which has minimized the cost of trucking and the downtime associated with weather-dependent access to some locations" (¶ 64); and (2) "The marketability of our production depends in part upon the availability, proximity, and capacity of pipelines, natural gas gathering systems, and processing facilities . . . If we experience interruptions or loss of pipelines or access to gathering systems that impact a substantial amount of our production, it could have material adverse effects on our business . . . ." (¶ 66). Plaintiff argues that these statements were false because at the time of the IPO, Lone Pine did not "transport by pipeline the majority of its oil production." Rather, Plains' Rainbow Pipeline transported Evi Area oil to market, which was closed indefinitely at the time of the Prospectus. Plaintiffs further allege that Defendants knew that the closure required them to transport oil from the Evi Area with trucks at increased transportation costs of seven to ten times more than when the pipeline was in operation.

5

**SPA-5**

Plaintiff has failed to show that the statements above are material misstatements. First, Plaintiff does not plead any facts establishing that Lone Pine's statements regarding its Evi area infrastructure were false or misleading. The Complaint does not allege any facts that establish that Lone Pine did not install this infrastructure or that at the time of the IPO, the temporary disruption of the pipeline was expected to prevent Lone Pine from continuing to transport a majority of its production by pipeline. Plaintiff does not allege that Lone Pine knew or should have known that the pipeline closure would have a significant impact on its future oil production. The Complaint does not plead any facts establishing that at the time of the IPO, Defendants knew or had reason to know that the pipeline disruption would prevent Lone Pine from marketing "a substantial amount of [its] production."

### B. Plaintiffs Failed to Allege a Material Omission of Information that Defendants had a Duty to Disclose

Plaintiff alleges that Defendants omitted material information about Lone Pine's reliance on the Rainbow Pipeline and its effects on Lone Pine's business, in violation of Item 303 of SEC Regulation S-K. Subsection (a)(3)(ii) of Item 303 provides that a registrant must report an "infrequent or unusual event" that "affected the amount of reported income from continuing operations . . ." and "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." *Panther Partners*, 681 F.3d at 120. Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a) instruction 3. Plaintiff argues that the Rainbow Pipeline rupture was an "unusual

6

event" that rendered Lone Pine's past income not necessarily indicative of its future financial results. Plaintiff further argues that it was a "known uncertainty" that the Rainbow Pipeline might never reopen because the ERCB closed the pipeline pending the results of its investigation.

A fact "'is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Hutchison*, 647 F.3d at 485. In other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (internal citation omitted). "[T]he fact that materiality is a 'mixed question of law and fact' does not render it immune from analysis at the motion to dismiss stage." *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, No. 11 Civ. 5097 (JFK), 2012 WL 3283481, at *6-7 (S.D.N.Y., Aug. 13, 2012) (quoting *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)). Dismissal is appropriate where Plaintiff fails to allege materiality. *Id*; *see also Hutchison*, 647 F.3d at 488-90; *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204-05 (2d Cir. 2009); *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012); *KKR Fin. Holdings LLC*, 2010 WL 4642554 at *12.

Courts in the Second Circuit rely on SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999) ("SAB No. 99") in assessing materiality and consider both quantitative and qualitative factors. *Hutchison,* 647 F.3d at 485. Under the quantitative factor, the SEC considers the financial magnitude of the misstatement. *See* SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150, 45150–52 (1999). Under the qualitative factor, the SEC considers: (1) whether

7

**SPA-7**

there was a concealment of an unlawful transaction; (2) the significance of the misstatement in relation to the company's operations; and (3) management's expectation that the misstatement will result in a significant market reaction. *See id.*

      1.   The Complaint Fails to Allege the Quantitative Materiality of the Pipeline Disruption

According to SAB No. 99, "'[t]he use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that . . . a deviation of less than the specified percentage . . . is unlikely to be material.'" *ECA*, 553 F.3d at 204 (quoting SAB No. 99). An omission or misstatement that has an impact of less than 5% on a company's reported financial metrics is presumptively immaterial. *Id.*

Here, the Amended Complaint pleads no facts establishing that the omission of the existence of the pipeline disruption had any quantitative impact on the financial information reported in the Prospectus, let alone one of 5% or more.

      2.   The Complaint Fails to Allege the Qualitative Materiality of the Pipeline Disruption

To plead qualitative materiality Plaintiff must specifically identify qualitative factors demonstrating a *substantial* likelihood that a reasonable shareholder would think that the addition of that fact "*significantly* alter[s] the 'total mix' of information made available." *Hutchison,* 647 F.3d at 485. (emphasis added). In addition, SAB No. 99 identifies certain considerations that may "render material a quantitatively small misstatement of a financial statement," including whether the misstatement arises from an item capable of precise measurement or from an estimate; whether the misstatement masks a change in earnings or other trends; and whether the misstatement concerns a segment or other portion of the registrant's

8

**SPA-8**

business that has been identified as playing a significant role in the registrant's operations or profitability.

The Amended Complaint pleads no facts that would establish that any of the various qualitative factors in SAB No. 99 apply here. It does not allege what Lone Pine reasonably should have expected the impact of the pipeline disruption would be at the time of its IPO. Nor does the Complaint provide facts from which this Court can infer that at the time of the IPO, Lone Pine should have expected an extended disruption and a material impact on sales, revenue or income.

Furthermore, Plaintiff has failed to plead that Defendants owed a duty to disclose the underlying problem itself because it had impacted interim financial results sufficiently to cause an "extreme departure from the range of results that could be anticipated based on currently available information." *Id.* (quoting *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 208 (S.D.N.Y. 2000); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1210 (1st Cir. 1996) (*superseded by statute on other grounds* in *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)). The fact that Lone Pine's average realized oil prices increased by 15% in the second quarter of 2011 shows that the pipeline disruption did not result in an "extreme departure" from the range of realized oil prices that could be expected based on the "currently available information."

### C. Plaintiffs Failed to Allege a Material Omission that Should Have Been Disclosed to Prevent the Prospectus from Being Misleading

Plaintiff alleges that Lone Pine's Prospectus was false and misleading because it omitted that "the Rainbow Pipeline rupture negatively affected Lone Pine's operations at the Evi area." Am. Compl. ¶ 63. Plaintiff asserts that this omission made the Prospectus misleading because "the closed pipeline added trucking costs and decreased Lone Pine's realized price of oil." Am.

9

**SPA-9**

Compl. ¶ 65. However, Plaintiff does not allege that Lone Pine knew whether or how the pipeline disruption might affect its quarterly results at the time of its May 26, 2011 IPO. Furthermore, the Amended Complaint alleges no facts from which this Court can infer that Lone Pine should have expected a material impact on sales, revenue, or income at the time of the IPO. To the contrary, Plaintiff alleges that at the time of the IPO that the Rainbow Pipeline had already been repaired, and that another recent pipeline outage nearby had lasted only a week. Am. Compl. ¶ 47. Nor does Plaintiff allege that that the pipeline disruption's effect on Lone Pine's realized oil prices would represent an "extreme departure" from the range of realized oil prices that could be expected based on the "currently available information." *Lin*, 574 F. Supp. 2d at 421. Thus, the allegations in the Complaint fail to allege that Lone Pine should have known that the pipeline disruption would be more than a short-term event or would materially impact Lone Pine's financial results.

Because the Amended Complaint fails to (i) identify a material misstatement; (ii) allege that Lone Pine ignored any legal disclosure obligation; or (iii) allege that Lone Pine omitted a material fact that would have prevented the prospectus from being misleading, the Amended Complaint fails to state a claim upon which relief can be granted.

### III.     Plaintiffs Fail to Plead a Section 15 Claim

Section 15 imposes control person liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under" Section 11. 15 U.S.C. § 77*o*(a). To establish Section 15 liability, a plaintiff must demonstrate (1) a primary violation of the securities laws and (2) control of the primary violator by defendants. *See Hutchison*, 647 F.3d at 490. Here, Plaintiff alleges that Lone Pine was a wholly-owned subsidiary of Forest Oil at the time of the IPO. Am. Compl. ¶ 128. Plaintiff further alleges that Forest Oil was a control

10

**SPA-10**

person of Lone Pine and is therefore liable. *Id.* Because Plaintiff fails to state a claim under

Section 11, however, it also fails to plead a primary violation of the securities laws that could

give rise to control person liability under Section 15. *See Lighthouse Fin. Grp. v. Royal Bank of*

*Scotland Grp., PLC*, No. 11 Civ. 398 (GBD), 2012 WL 4616958 (S.D.N.Y. Sept. 28, 2012)

(dismissing Section 15 claims where Plaintiff failed to allege an underlying primary violation).

Therefore, Plaintiff's Section 15 claim against Forest fails as a matter of law.

## IV.    Plaintiff Fails to State a Section 12(a)(2) Claim Against the Underwriter Defendants

Because the Complaint fails to allege that Defendants made a material representation or

omission under Section 11, it likewise fails to state a claim under Section 12(a)(2). "Claims

under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements. . .

." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). "A plaintiff

who fails to plead a § 11 claim necessarily fails to plead a § 12(a)(2) claim as well." *In re Agria*

*Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 525 (S.D.N.Y. 2009) (quotation omitted).  Under Section

12(a)(2), a seller that "offers or sells a security . . . by means of a prospectus or oral

communication, which includes an untrue statement of a material fact or omits to state a material

fact necessary in order to make the statements . . . not misleading" may be liable to a purchaser

of such security. 15 U.S.C. § 77*l*(a)(2).  Section 12(a)(2) claims are properly dismissed for the

failure to identify a false or misleading statement or omission, on the ground that the alleged

misstatement is not material, and pursuant to the negative causation defense. *See Lasker v. N.Y.*

*State Elec. & Gas Corp.*, 85 F.3d 55, 57-58 (2d Cir. 1996) (Section 11 and Section 12 claims

both "require[] that [plaintiff] identify a materially misleading statement made by the

defendants"); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005) ("Materiality

is . . . a required element for claims under both § 11 and § 12(a)(2)."); *Blackmoss Invs. Inc. v.*

*ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010) (with respect to both Section 11 and 12(a)(2) claims, "a negative causation defense may be considered on a dismissal motion where the absence of loss causation is apparent on the face of the complaint"). For the same reasons that Plaintiff fails to plead a Section 11 claim, Plaintiff's Section 12(a)(2) claim against the Underwriter Defendants is dismissed.

## CONCLUSION

Defendant's Motion to Dismiss is GRANTED.

Dated: March 26, 2014
New York, New York

SO ORDERED

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge

12

**SPA-12**

Case 1:12-cv-04839-GBD Document 73 Filed 03/27/14

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│                                  │
│ DOCUMENT                         │
│                                  │
│ ELECTRONICALLY FILED             │
│                    3/31/2014     │
└─────────────────────────────────┘
```

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

In Re Lone Pine Resources, Inc.

12 **CIVIL** 4839 (GBD)

## JUDGMENT

-------------------------------------------------------------

Defendants, Lone Pine Resources Inc., Forest Oil Corporation, David M. Anderson, Michael N. Kennedy, H. Craig Clark, Patrick R. McDonald, David M. Fitzpatrick, Loyola G. Keough and H. Clayton Peterson having moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) of the Federal Rules of Civil Procedure, dismissing the Consolidated Amended Complaint against the Defendants, with prejudice, on March 22, 2013 (Doc. #56), and Underwriter Defendants, J.P. Morgan Securities LLC, Credit Suisse Securities (USA) LLC and TD Securities (USA) LLC, on March 22, 2013, (Doc. #59) and the matter having come before the Honorable George B. Daniels, United States District Judge, and the Court, on March 27,2014, having rendered its Memorandum Decision & Order (Doc.#73) and granting Defendants' Motion to Dismiss, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Decision & Order dated March 27, 2014, Defendants' and Underwriter Defendants' motion to dismiss (Doc. #56 & Doc. #59) are granted; accordingly, the case is closed.

**Dated:**  New York, New York
       March 31, 2014

**RUBY J. KRAJICK**

**Clerk of Court**

**BY:** _____

*K. Mango*

**Deputy Clerk**