# 14-1471-CV

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

ADAR INVESTMENT FUND, LTD,

*Plaintiff-Appellant,*

TODD AUGENBAUM,

Individually and On Behalf of All Others Similarly Situated,

*Plaintiffs,*

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

PETER E. KAZANOFF
SIMPSON THACHER
 & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

*Attorneys for Defendants-Appellees
 J.P. Morgan Securities LLC, Credit
 Suisse Securities (USA) LLC, and
 TD Securities (USA) LLC*

CLIFFORD L. THAU
STEVEN PARADISE
VINSON & ELKINS LLP
666 5th Avenue
New York, New York 10103
(212) 237-0000

*Attorneys for Defendants-Appellees
 Forest Oil Corporation, David M.
 Anderson, Michael N. Kennedy,
 H. Craig Clark, Patrick R.
 McDonald, Loyola G. Keough,
 David M. Fitzpatrick, and
 H. Clayton Peterson*

RALPH HOLL, individually and on behalf of all others similarly situated,
TODD AUGENBAUM, Individually and On Behalf of All Others
Similarly Situated,

*Consolidated-Plaintiffs,*

—against—

FOREST OIL CORPORATION, DAVID M. ANDERSON, MICHAEL N. KENNEDY, H.
CRAIG CLARK, PATRICK R. MCDONALD, LOYOLA G. KEOUGH, DAVID M.
FITZPATRICK, H. CLAYTON PETERSON, J.P. MORGAN SECURITIES LLC, CREDIT
SUISSE SECURITIES (USA) LLC, TD SECURITIES (USA) LLC,

*Defendants-Appellees,*

LONE PINE RESOURCES, INC.,

*Defendant.*

# CORPORATE DISCLOSURE STATEMENTS

Forest Oil Corporation has no corporate parent and no publicly held corporation owns ten percent (10%) or more of Forest Oil Corporation's stock.

J.P. Morgan Securities LLC is a wholly-owned subsidiary of JPMorgan Broker-Dealer Holdings, Inc., which, in turn, is a wholly-owned subsidiary of JPMorgan Chase & Co. JPMorgan Chase & Co. has no parent company and no publicly held corporation owns 10% or more of its stock.

Credit Suisse Securities (USA) LLC is a wholly-owned subsidiary of Credit Suisse (USA), Inc. Credit Suisse (USA), Inc. is a wholly-owned subsidiary of Credit Suisse Holdings (USA), Inc., which is jointly-owned by (1) Credit Suisse Group AG, and (2) Credit Suisse AG, a wholly-owned subsidiary of Credit Suisse Group AG, which is a corporation organized under the laws of the Country of Switzerland and whose shares are publicly traded on the SIX Swiss Exchange and are also listed on the New York Stock Exchange in the form of American Depositary Shares. No publicly held corporation owns 10% or more of Credit Suisse Group AG's stock.

TD Securities (USA) LCC is a wholly-owned subsidiary of TD Holdings II Inc. TD Holdings II Inc. is a wholly-owned subsidiary of Toronto Dominion Holdings (U.S.A.), Inc., which is a wholly-owned subsidiary of The Toronto-Dominion Bank, a chartered bank organized under the laws of Canada whose

i

shares are publicly traded on the Toronto and New York Stock Exchanges. No publicly held corporation owns 10% or more of The Toronto-Dominion Bank stock.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENTS ......................................................i

TABLE OF AUTHORITIES ................................................................................v

STATEMENT OF THE ISSUES........................................................................1

STATEMENT OF THE CASE...........................................................................3

I.     The Rupture and Prompt Repair of a Pipeline Owned and Operated by
       a Third Party. ........................................................................................3

II.    The Impact of the Pipeline Disruption on Lone Pine's Financial
       Statements and Stock Price.....................................................................5

III.   The Amended Complaint.........................................................................7

IV.    The District Court Dismisses the Amended Complaint. ..................8

SUMMARY OF ARGUMENT ..........................................................................10

ARGUMENT .....................................................................................................13

I.     Standard of Review.................................................................................13

II.    The District Court Properly Held That Appellant Did Not Allege Facts
       Sufficient To Show the Materiality of the Rainbow Pipeline
       Disruption. ..............................................................................................14

       A.    Under the <u>Quantitative</u> Materiality Factor, the Rainbow
             Pipeline Disruption Was Presumptively Immaterial.........................15

             1.    The impact on Lone Pine's financial reporting of
                   disclosing the Rainbow Pipeline disruption in the
                   Prospectus would have been 0%...............................................16

             2.    Appellant uses the wrong line item when it compares
                   transportation costs to net earnings..........................................19

             3.    Appellant overestimates the effect of the Rainbow
                   Pipeline disruption on Lone Pine's expenses. ..........................21

4.      Appellant overestimates the effect of the Rainbow Pipeline disruption on Lone Pine's revenues...........................23

B.      The Qualitative Materiality Factor Likewise Shows That the Rainbow Pipeline Disruption Was Not Material. ...............................25

1.      The only notable "trends" following the Rainbow Pipeline disruption are increases to Lone Pine's revenues, oil production, and stock price...................................................26

2.      The effect of the Rainbow Pipeline disruption on Lone Pine was not capable of precise measurement........................28

3.      The Rainbow Pipeline disruption only impacted one segment of Lone Pine's business. .............................................29

III.    Appellant Did Not Sufficiently Allege That Lone Pine Had a Legal Duty To Disclose the Rainbow Pipeline Disruption. ...................................30

A.      Item 303 of Regulation S-K Did Not Require Lone Pine To Disclose the Rainbow Pipeline Disruption. ........................30

B.      Lone Pine's Statements About Its Own Infrastructure and Transportation Costs Did Not Obligate Lone Pine To Make Disclosures About a Pipeline Owned and Operated by a Third Party.................................................................33

IV.     Appellant's Failure To Plead a Section 11 Claim Forecloses Any Claim Under Section 15. ...............................................39

CONCLUSION .................................................39

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a).....................40

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................ 13, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................13

*Caiola v. Citibank, N.A., New York*,
295 F.3d 312 (2d Cir. 2002) .........................................................35

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan*
*Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ................................................. passim

*Ganino v. Citizens Utilities Co.*,
*228 F.3d 154 (2d Cir. 2000)* ................................... 17, 19, 20, 22

*Hutchison v. Deutsche Bank Sec. Inc.*,
647 F.3d 479 (2d Cir. 2011) .................................................. passim

*In re Nortel Networks Corp. Secs. Litig.*,
539 F.3d 129 (2d Cir. 2008) .........................................................15

*In re Par Pharmaceutical, Inc. Secs. Litig.*,
733 F. Supp. 668 (S.D.N.Y. 1990) ................................................29

*In re ProShares Trust Sec. Litig.*,
728 F.3d 96 (2d Cir. 2013) ...........................................................34

*Litwin v. Blackstone Group, L.P.*,
634 F.3d 706 (2d Cir. 2011) ................................................... 29, 31

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ........................................................36

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
900 F.2d 576 (2d Cir. 1990) .........................................................36

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*,
  595 F.3d 86 (2d Cir. 2010) ........................................................................ 37, 38

*Panther Partners Inc. v. Ikanos Communications, Inc.*,
  681 F.3d 114 (2d Cir. 2012) ...................................................................... 32, 33

*Rapoport v. Asia Elecs. Holding Co.*,
  88 F. Supp. 2d 179 (S.D.N.Y. 2000) ............................................................... 14

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996) ............................................................................. 14

*Shapiro v. UJB Finance Corp.*,
  964 F.2d 272 (3d Cir. 1992) ............................................................................ 35

*Silverstrand Investments v. AMAG Pharmaceuticals, Inc.*,
  707 F.3d 95 (1st Cir. 2013) ......................................................................... 32, 33

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ...................................................................... 35, 36

## **Statutes**

17 C.F.R. 229.303(a)(3)(ii) .................................................................... passim

## **Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................... 10, 13

## **Other Authorities**

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999) .............. passim

## STATEMENT OF THE ISSUES

1.  *Materiality*—Did the District Court correctly hold that Appellant failed adequately to plead that the Rainbow Pipeline disruption was material to investors in Lone Pine's Initial Public Offering?

    A.    Did the District Court correctly hold that Appellant did not adequately plead the materiality of the Rainbow Pipeline disruption where that disruption resulted in a short-term increase (four months) in a single expense item (transportation costs) in one segment of Lone Pine's business (oil production) in one region (the Evi area)?

    B.    Did the District Court correctly hold that there is no "*substantial* likelihood" that a reasonable shareholder would think that the Rainbow Pipeline disruption "*significantly* alter[s] the 'total mix' of information made available" to investors? SPA-7 (Order at 7) (citing *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (emphasis added) (citation omitted)).

2.  *Duty to Disclose*—Did the District Court correctly hold that Lone Pine did not have a duty to disclose the Rainbow Pipeline disruption in the Prospectus?

    A.    Did the District Court correctly conclude that Lone Pine had no duty to disclose the Rainbow Pipeline disruption under Item 303(a)(3)(ii) of

SEC Regulation S-K where it found that Appellant failed sufficiently to plead that management had reason to believe that a short-term (four month) disruption to one segment of Lone Pine's business would have any material consequences for the company and Item 303(a)(3)(ii) only requires disclosure of information that management expects will have a material impact on operations?

B.    Was the District Court correct in concluding that Lone Pine's statements about Lone Pine's *own* transportation infrastructure did not impose a duty on Lone Pine to make disclosures about the transportation infrastructure of *third parties—i.e.*, the Rainbow Pipeline owned by Plains Midstream Canada?

## STATEMENT OF THE CASE

Lone Pine is "an independent oil and gas exploration, development, and production company" with operations in Canada. A-27 (¶ 34). Lone Pine's IPO took place on May 26, 2011, the same day that Lone Pine filed its final Prospectus, which constituted a part of its registration statement. A-21 (¶ 1), A-32 (¶ 57). Lone Pine has "a well-balanced portfolio of oil and gas properties, consisting of low-risk natural gas and premium-priced light oil resource plays, as well as significant undeveloped potential associated with two shale gas plays;" those properties include holdings in the Evi area in Alberta, Canada. A-71 (Paradise Decl. Ex. A at 2). Lone Pine's Prospectus disclosed that approximately 24% of Lone Pine's estimated proven reserves as of December 31, 2010 were attributed to its Evi light oil property. *Id*.

## I.    The Rupture and Prompt Repair of a Pipeline Owned and Operated by a Third Party.

On April 29, 2011, four weeks before the IPO, Plains Midstream Canada ("Plains"), the owner and operator of an oil pipeline in Alberta named the Rainbow Pipeline, announced "a release of crude oil along a remote section of the Rainbow Pipeline, in the Evi area" and closure of the pipeline. A-29 (¶ 44). This pipeline was used by several energy companies, including Lone Pine. Lone Pine used the pipeline to deliver to market the majority of the crude oil it produced in the Evi area. A-21(¶ 4). Plains, the Energy Resources Conservation Board of Alberta (the

"ERCB"), which regulates Alberta's energy resources, and other agencies announced on the day of the disruption that they were already working to clean up the spill and repair the pipeline. *See* Electronic Record ("ER") 66-2 (Paradise Decl. Ex. B); *see also* A-29 (¶ 46).

The "Rainbow leak was the second to happen in Alberta in less than two weeks," and the pipeline involved in the prior leak resumed operations after only one week. A-30 (¶ 47). By May 2, 2011, Plains was already approved to resume partial operation of the Rainbow Pipeline (the southern segment, not the northern segment in the Evi area where the rupture occurred). ER 66-3 (Paradise Decl. Ex. C). Plains explained that it had completed "[p]hysical pipeline repairs" by May 4, 2011 and that restarting the line would require regulatory approval. ER 66-4 (Paradise Decl. Ex. D at 76); *see also* A-30 (¶ 49).

Around the same time, the ERCB said it would "take a cautious approach to authorizing the pipeline's reopening" to "determine if it's a one-time thing that happened there or if it's evidence of a systemic problem with the line." A-31 (¶ 51). On May 4, 2011, Plains announced that:

> The pipeline has been excavated and examined by the Alberta authorities. Based on this inspection and the recently interpreted results of pipeline integrity tool runs, it appears this is a *singular* failure and *not a systemic* problem. Plains is working to repair the line and bring it into service as quickly as possible.

*See* ER 66-4 (Paradise Decl. Ex. D at 76) (emphasis added).

4

Thus, by May 4, 2011, publicly disclosed information confirmed that repairs on the pipeline had been completed and regulatory approval was presumptively forthcoming. On August 16, 2011, less than three months after the IPO, the ERCB announced that:

> Following a comprehensive review and assessment, and a third-party engineering review of the incident . . . the [ERCB] has provided conditional approval to [Plains] to resume operations of the NPS 20 Rainbow Pipeline following the failure on April 28, 2011.

ER 66-6 (Paradise Decl. Ex. F). On August 26, 2011, after Plains had satisfied the ERCB's conditions, Plains announced that it would resume full service on August 30, 2011. ER 66-7 (Paradise Decl. Ex. G).

## II.    The Impact of the Pipeline Disruption on Lone Pine's Financial Statements and Stock Price.

After the IPO, but before the Rainbow Pipeline resumed servicing the Evi area, Lone Pine issued a press release on August 2, 2011 disclosing its financial results for the second quarter of 2011. A-350-362 (Paradise Decl. Ex. H); A-35 (¶ 73). The press release explained that the pipeline disruption had led Lone Pine to truck some of its oil production to market and that this increased cost had a negative impact on the prices Lone Pine received for oil produced in that area. A-354 (Paradise Decl. Ex. H at 5); A-35 (¶ 73). Lone Pine also held a conference call to discuss its second quarter 2011 results and explained that:

> In late April, the major oil sales pipeline in the [Evi]
> area [the Rainbow Pipeline] ha[d] ruptured and [has]
> been out of service ever since. Lone Pine [has] been
> trucking oil volumes to [a] sales point and is happy to
> report we had not seen any major disruption of
> volumes or restricted access to services at that time.
> The cost of [the] trucking of our oil volumes,
> however, has increased by an average of $7 to $10 per
> barrel depending on the length of the trip, and this
> [has] negatively affected our margins in the area, but
> the economics [at play] still remain very robust. We
> expect the pipeline to be back in service by this fall.

A-365 (Paradise Decl. Ex. I at 2); A-35 (¶ 74). Lone Pine further explained that its

"second quarter realized price includes the effect of incremental trucking cost at

Evi, as we account for that cost as a reduction in our realized prices as opposed to

our ongoing operating cost." A-366 (Paradise Decl. Ex. I at 3). As explained in the

August 2 press release, Lone Pine's average realized oil price actually *increased*

15% in the second quarter of 2011[1] and its volume of oil production increased by

66%. A-354-55 (Paradise Decl. Ex. H at 5-6); A-36 (¶ 77).

About 75% of Lone Pine's 154,000 barrels of oil production in the first

quarter of 2011 (115,500 barrels) came from the Evi area. A-144 (Paradise Decl.

---

[1] Appellant mistakenly alleges that the "oil price differential realized in
2Q2011 had increased by 15%," confusing the percentage price increase with the
percentage price *differential*. A-35 (¶ 73). As described in the Prospectus, the oil
price differential is the difference between oil's trading price on the NYMEX WTI
and the sales price of Lone Pine's oil after factoring in transportation costs and
crude grade. A-36 (¶ 76).

Ex. A at 73), A-71 (Paradise Decl. Ex. A. at 2). A decrease of $10 per barrel (the high range of the increased transportation costs) on each of those barrels ($1,155,000.00) would have decreased Lone Pine's revenue for that quarter by about 3%. *Id.* At the time of the IPO, the pipeline disruption could only have impacted two-thirds of the second quarter of 2011 financials because the disruption began at the end of April (one third of the way through the second quarter). A-28-29 (¶¶ 43-44).

When the pipeline disruption's impact on Lone Pine was disclosed on August 2, Lone Pine's share price closed at $11.84, one cent higher than the prior day. A-374 (Paradise Decl. Ex. J). Then, from August 2 to August 5, Lone Pine's stock price declined but outperformed the S&P 500, the S&P Exploration and Production Index (an index of publicly-held exploration and production companies), and the price of oil. Lone Pine's stock price moved in tandem with the price of natural gas, which is not surprising given that natural gas makes up the majority of Lone Pine's assets. *Id.*; A-71 (Paradise Decl. Ex. A at 2).

### III.    The Amended Complaint.

Lone Pine's realized oil prices and production increased significantly after the IPO and its stock price did not decline on the date of disclosure of the pipeline disruption. Nevertheless, Appellant asserted claims against Appellees alleging that the Prospectus did not disclose that "the Rainbow Pipeline rupture negatively

7

affected Lone Pine operations at the Evi area." A-32 (¶ 63). Appellant further asserted in a wholly conclusory fashion that (1) a disclosure regarding the pipeline disruption would have "significantly altered the total mix of information available to investors when deciding whether to purchase Lone Pine common stock" (A-34 (¶ 68)); (2) the omission of the disclosure "prevented investors from discounting the value of Lone Pine common stock for material, existing risks to Lone Pine's operations" (A-34 (¶ 70)); and (3) the disclosure was required per SEC rules (A-34-35 (¶¶ 71-72)). Moreover, Appellant alleged that the omission of information about the pipeline disruption made statements about the marketability of Lone Pine's oil and natural gas production (A-33 (¶ 66)) and its infrastructure in the Evi area (A-33 (¶ 64)) false or misleading and caused Lone Pine to overstate its "present value" (A-34 (¶ 69)).

## IV.    The District Court Dismisses the Amended Complaint.

On March 27, 2014, Judge Daniels issued an Order granting Appellees' motions to dismiss. SPA-1-2 (Order at 1-2). In that Order, the District Court first held that Appellant failed to allege facts showing that "Lone Pine's statements [in the Prospectus] regarding [the] Evi area infrastructure were false or misleading." *Id.* at 6. The District Court determined as a matter of law that the statements in the Prospectus challenged by Appellant were true and that Lone Pine did not omit any material information. *Id.*

8

Next, the District Court held that the Rainbow Pipeline disruption was not material information that Lone Pine had a duty to disclose in the Prospectus. As to the issue of materiality, the District Court found "the Amended Complaint pleads no facts establishing that the omission of the existence of the pipeline disruption had any quantitative impact on the financial information reported in the Prospectus, let alone one of 5% or more." *Id.* at 8. The District Court then reasoned that the Rainbow Pipeline disruption was not qualitatively material because the Amended Complaint does not allege (1) "what Lone Pine reasonably should have expected the impact of the pipeline disruption would be at the time of its IPO," or (2) facts to support an inference "that at the time of the IPO, Lone Pine should have expected an extended disruption and a material impact on sales, revenue or income." *Id.* at 9.

Finally, the District Court held that Lone Pine did not have a duty to disclose the Rainbow Pipeline disruption to prevent other information in the Prospectus from being misleading. *Id.* at 10. The District Court emphasized Appellant's failure to "allege that Lone Pine knew whether or how the pipeline disruption might affect its quarterly results at the time of its May 26, 2011 IPO" or that "Lone Pine should have expected a material impact on sales, revenue, or income at the time of the IPO." *Id.* Because there was no reason to think that the Rainbow Pipeline disruption would have a negative impact on these financial metrics, Lone

9

Pine did not have a duty to disclose that disruption to prevent the Prospectus from being misleading. *Id.* Tellingly, in this appeal, Appellant virtually ignores Judge Daniels's Order and fails to identify any error in his reasoning, any improper reliance on authority to support his ruling, or any misunderstanding of Appellant's arguments below.

Subsequently, judgment was issued and the Clerk of the Court was ordered to close the case. SPA-13 (Judgment). Appellant filed its notice of appeal on April 28, 2014. By Order dated May 29, 2014, the appeal was withdrawn with prejudice as to Appellee Lone Pine. A-375-76 (Notice of Appeal).

## **SUMMARY OF ARGUMENT**

The District Court correctly dismissed Appellant's Section 11 and Section 15 claims under Rule 12(b)(6) because the Amended Complaint does not allege facts sufficient to show that the Rainbow Pipeline disruption was a material fact that Lone Pine had a duty to disclose in the Prospectus. Instead of explaining how or why the District Court's ruling was incorrect, Appellant relies on misleading calculations, and in some cases miscalculations, to argue that the Rainbow Pipeline disruption was material to investors in Lone Pine's IPO.

For example, in its "quantitative materiality" analysis, Appellant argues that Lone Pine's oil transportation costs are 31%, 9–13%, and 7–10% of arbitrary financial metrics that Appellant creates to give the appearance that the allegedly

omitted information was material. These metrics are not publicly reported and Appellant cannot plausibly claim that Lone Pine investors would have considered this information material to their investment decision. And even those arbitrary percentages are inflated given Appellant's erroneous assumptions about the impact of the Rainbow Pipeline disruption. Judge Daniels correctly observed that disclosure of the Rainbow Pipeline disruption would not have changed Lone Pine's reported financial information by even 1%. SPA-8 (Order at 8).

In its "[q]ualitative [m]ateriality" analysis, Appellant claims that Lone Pine's silence as to the Rainbow Pipeline disruption "hid[] a change" in trends and prevented investors from learning that Lone Pine was threatened with "shutting down oil production." Br. App't at 5, 16, 18–19 (emphasis added). But in reality, following the Rainbow Pipeline disruption, Lone Pine <u>increased</u> its revenues, average realized oil price, and oil production volume. Indeed, the immateriality of the Rainbow Pipeline disruption is plain given that the disruption caused only a short-term (four-month) increase in a single expense item that was not even reported as a separate expense (transportation costs) affecting only a small segment of Lone Pine's business (oil production) in one area that accounted for less than 25% of Lone Pine's total oil and gas assets (the Evi area).

Nor can Appellant show that the District Court erred when it found Lone Pine did not have a duty to disclose the Rainbow Pipeline disruption in the

11

Prospectus. Appellant argues that Lone Pine was required to disclose the pipeline disruption based on Item 303(a)(3)(ii) of SEC Regulation S-K. But Item 303(a)(3)(ii) requires disclosure only of information that management reasonably expects will materially affect the registrant's financial condition or operations, and, as the District Court found (SPA-8 (Order at 8)), there are no facts pleaded that suggest management had any reason to have such an expectation here. To the contrary, another pipeline in the same area ruptured two weeks earlier and was back in service in a week. Within days of the Rainbow Pipeline disruption, the ERCB approved resuming use of part of the pipeline. Ultimately, the Rainbow Pipeline rupture caused only a four-month disruption that increased only a single expense item affecting only part of Lone Pine's business.

Appellant is likewise wrong in arguing that Lone Pine's statements about its own transportation infrastructure created a duty to comment about the Rainbow Pipeline, which is transportation infrastructure owned by a third party, Plains. The District Court rejected this argument (SPA-10 (Order at 10)), and Appellant cites no case imposing such an open-ended disclosure requirement on securities issuers.

In short, the District Court properly dismissed the Amended Complaint, and Appellees respectfully suggest that the judgment below should be affirmed in all respects.[2]

## ARGUMENT

### I.    Standard of Review.

This Court applies a *de novo* standard in reviewing a District Court's dismissal of a complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Hutchison v. Deutsche Bank Secy. Inc.*, 647 F.3d 479, 483–84 (2d Cir. 2011). A complaint must be dismissed under Rule 12(b)(6) if it does not contain sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As is the case here, a plaintiff may not substitute bald allegations for well-pleaded facts. A plaintiff must plead facts that, if true, are sufficient "to raise a right to relief above the speculative level" and to "nudge[] their claims across the line from conceivable to plausible." *Id.* at 555, 570. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotations and citation omitted).

---

[2] The District Court similarly dismissed Appellant's Section 12 claim, which Appellant is not appealing. Br. App't at 1 n.2.

13

Although the Court construes well-pleaded facts as true, not all factual allegations are "entitled to the assumption of truth." *Id.* The Court need not accept as true assertions that "amount to nothing more than a 'formulaic recitation of the elements' of a . . . claim." *Id.* at 681. Nor should the Court accept allegations that are clearly contradicted by the documents incorporated by reference into the Amended Complaint. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 808–09 (2d Cir. 1996); *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

## II. The District Court Properly Held That Appellant Did Not Allege Facts Sufficient To Show the Materiality of the Rainbow Pipeline Disruption.

Appellant argues that the Rainbow Pipeline disruption was material information that Lone Pine omitted from the Prospectus. Br. App't at 13–20.[3] A fact is material only when there is a "*substantial* likelihood" that a reasonable shareholder would think that the addition of that fact "*significantly* alter[s] the 'total mix' of information made available" to investors. *Hutchison*, 647 F.3d at 485 (emphases added). In assessing materiality, this Court looks to SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999) ("SAB No. 99"). *Id.* Under SAB No. 99, the materiality of a statement is determined by analyzing both a <u>quantitative</u> and a <u>qualitative</u> materiality factor. *Id.* As discussed below,

---

[3] Appellant has abandoned the argument it made in the District Court that the Prospectus contained affirmative misrepresentations. Br. App't at 12–13 & n.11.

14

Appellant cannot show that the District Court erroneously concluded that Appellant had failed to allege sufficiently that the Rainbow Pipeline disruption was <u>quantitatively</u> or <u>qualitatively</u> material.

### A.    Under the <u>Quantitative</u> Materiality Factor, the Rainbow Pipeline Disruption Was Presumptively Immaterial.

Under the quantitative factor, "[t]he use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that . . . a deviation of less than the specified percentage . . . is unlikely to be material." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (quoting SAB No. 99). An omission or misstatement that has an impact of less than 5% on the relevant and reported financial metric is presumptively immaterial. *Id.*

Appellant argues that the Rainbow Pipeline disruption was material because, according to Appellant, that disruption: (1) caused Lone Pine to incur transportation costs amounting to 31% of Lone Pine's net earnings, (2) increased Lone Pine's oil transportation costs by ten times, and (3) amounted to 7%–10% of Lone Pine's oil revenues. Br. App't at 15–16.[4]

---

[4] Appellant did not argue in the District Court that the increased transportation costs due to the Rainbow Pipeline disruption amounted to 31% of Lone Pine's net earnings or increased Lone Pine's oil transportation costs by "ten times." Appellant "waived th[ese] argument[s] by failing to present [them] below." *In re Nortel Networks Corp. Secs. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) (per curiam). In any event, these arguments also fail on the merits.

15

Appellant's argument is at best disingenuous. Disclosure of the Rainbow Pipeline disruption would not have impacted the financial information in the Prospectus by even a fraction of a percentage point. Moreover, Appellant improperly compares Lone Pine's oil transportation costs to Lone Pine's net earnings and then overestimates the share of Lone Pine's transportation costs attributable to the Rainbow Pipeline disruption. Ultimately, the District Court correctly held that Appellant did not sufficiently plead that the Rainbow Pipeline disruption was quantitatively material, and Appellant's ginned up numbers do not prove otherwise.

> **1.    The impact on Lone Pine's financial reporting of disclosing the Rainbow Pipeline disruption in the Prospectus would have been 0%.**

The District Court held that "the Amended Complaint pleads no facts establishing that the omission of the existence of the pipeline disruption had **<u>any</u> quantitative impact on the financial information reported in the Prospectus**, let alone one of 5% or more." SPA-8 (Order at 8) (emphasis added). The District Court correctly focused on the "impact" that a disclosure would have had on the "financial information reported in the Prospectus." After all, this Court's analysis of quantitative materiality is rooted in SAB 99, an SEC accounting bulletin published to address whether a "misstatement or omission" of an item on a financial statement is presumptively immaterial. The role of the quantitative

16

analysis under SAB 99 is to determine whether misstated or omitted information would cause a *reported* line item to **change** by more or less than 5%.

This Court has applied SAB No. 99 in precisely that way. In *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, the plaintiffs alleged that the defendant improperly characterized $2 billion of one asset class as belonging to a different asset class. 553 F.3d at 204. This Court held that the alleged misstatement was not quantitatively material because correct classification of the asset in question "**does not alter [defendant's] total assets**." *Id.* (emphasis added).

In *Ganino v. Citizens Utilities Co.*, the plaintiff alleged that the defendant improperly recognized, as revenue for the first and second quarters of 1996, revenue that should have been booked in 1995. 228 F.3d 154, 158 (2d Cir. 2000). In assessing whether this allegedly improper revenue recognition was quantitatively material, this Court focused on how much the reported financial information **would have changed** but for the allegedly improper revenue recognition. *Id.* at 163–65.

Finally, in *Hutchison v. Deutsche Bank Securities Inc.*, the plaintiffs alleged that the defendant's registration statement was materially inaccurate because the statement failed to disclose that $51.5 million in reported loans were impaired— meaning "it is deemed probable that the Company will be unable to collect all

17

amounts due." 647 F.3d at 482 & n.2. This Court assessed the quantitative materiality of this alleged omission by comparing the amount of the impaired loans to the amount of the defendant's entire investment portfolio, so as to determine the extent to which the investment portfolio **would have changed** if the defendant had disclosed that the loans in question were impaired. *Id.* at 488–89.

As the District Court recognized, the Amended Complaint does not allege that disclosure of the Rainbow Pipeline disruption would have changed Lone Pine's reported earnings, revenues, or expenses (including transportation costs) by 1%, or by even one penny. Indeed, the 2011 first quarter financial information reported in the Prospectus was unaffected by the Rainbow Pipeline disruption which occurred only after the first quarter of 2011 had closed.

Appellant cannot show that any of Lone Pine's reported financial information was incorrect. Instead, Appellant generates nominally large figures— *e.g.*, "31%" and "ten times"—by comparing Lone Pine's oil transportation costs for the second and third quarters of 2011 to the first quarter financial information and to Lone Pine's second quarter financial information (which was not reported in the Prospectus at all). Br. App't at 15–16. This is not the quantitative materiality analysis SAB 99 calls for or this Court has applied in prior cases. The District Court faithfully followed this Court's guidance in applying SAB 99 and correctly determined that "the Amended Complaint pleads no facts establishing that the

18

omission of the occurrence of the pipeline disruption had any quantitative impact on the financial information reported in the Prospectus, let alone one of 5% or more." (SPA-8 (Order at 8)).

### 2. Appellant uses the wrong line item when it compares transportation costs to net earnings.

Even if Appellant were correct in comparing Lone Pine's transportation costs to reported first quarter financials (that were correctly reported in the Prospectus) and then unreported second quarter financials (that were not reported in the Prospectus at all), Appellant's quantitative-materiality argument would still fail. Appellant claims that the disclosure of the Rainbow Pipeline disruption was quantitatively material because, according to Appellant, the dollar amount increase in Lone Pine's transportation costs was 31% of the dollar amount of Lone Pine's net earnings for the second quarter of 2011. Br. App't at 15. Transportation costs, however, should be compared with total expenses or revenues, not net earnings.

In *Ganino*, this Court held that, when analyzing a misstatement or omission for quantitative materiality, "the items in issue should be compared to like items on the corporate financial statement." 228 F.3d at 165. For example:

- "reserves for dubious <u>accounts receivable</u>" should be compared to "<u>total assets</u>";

- "<u>loss reserves</u>, which for accounting purposes 'most immediately' affects income," should be compared to "<u>total income</u> for [the] relevant period";

- "dollar amount of backlog orders, <u>a revenue item</u>," should be compared to "<u>total revenues</u>"; and

- the value of a "<u>real estate loan</u>" should be compared to the "<u>total real estate loan portfolio</u> for year."

*Id.* (emphases added). Similarly, in *ECA*, this Court determined that an allegedly improper classification of assets was not quantitatively material by comparing (1) the value of the misclassified assets with (2) the value of the defendant's total assets. 553 F.3d at 204. Finally, in *Hutchison*, this Court rejected the plaintiffs' attempt to compare the value of allegedly bad loans with arbitrary financial metrics against which the bad loans "could loom as material in quantitative terms." 647 F.3d at 488. The Court held that the value of the bad loans must be compared to the defendant's "entire investment portfolio" to determine whether the defendant's omission of problems with the loans was quantitatively material. *Id.*

By comparing transportation costs to net earnings, Appellant ignores this Court's guidance in *Ganino*, *ECA*, and *Hutchison* about how to analyze quantitative materiality, and instead attempts to use misleading numbers against which it hopes Lone Pine's transportation costs might "loom as material." 647 F.3d at 488. Rather than comparing Lone Pine's transportation costs to net earnings, Lone Pine's transportation costs should be compared to either Lone Pine's total expenses or total revenues. Transportation costs are an expense item, and the increased transportation costs due to the Rainbow Pipeline disruption were

20

accounted for as a reduction in the prices or revenues Lone Pine received. A-36 (¶ 76 (acknowledging that the price at which the company sold barrels of oil factored into transportation costs)). Appellant's attempt to manufacture quantitative materiality should be rejected.

### 3. Appellant overestimates the effect of the Rainbow Pipeline disruption on Lone Pine's expenses.

Appellant also argues that the Rainbow Pipeline disruption was quantitatively material because that disruption temporarily increased Lone Pine's oil transportation costs by "up to ten times"—*i.e.*, an increase in oil transportation costs from $1–$2 per barrel (the cost to transport oil by pipeline) to $7–$10 per barrel (the cost to transport oil by truck). Br. App't at 5, 15–16 & n.6, 19. Even if Lone Pine had reported a temporary increase in oil transportation costs, the information would not have been useful to investors because "oil transportation costs" were not disclosed in the Prospectus. As a result, there is not a "substantial likelihood that the disclosure of [a temporary increase in oil transportation costs] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Hutchison*, 647 F.3d at 485 (citation omitted).

Furthermore, Appellant's attempt to manufacture quantitative materiality by alleging that "33%" of Lone Pine's business "incurred costs up to ten times more than usually incurred to transport the oil by pipeline" (Br. App't at 15–16) again

21

ignores this Court's guidance in *Ganino*, *ECA*, and *Hutchinson* (which Judge Daniels followed) to assess quantitative materiality by analyzing the allegedly omitted or misstated information in the context of the broader category into which that information falls. Appellant has not alleged that the dollar value of the increased cost to transport oil due to the Rainbow Pipeline disruption was more than 5% of the dollar value of Lone Pine's total expenses. Nor could Appellant make such an allegation. About 75%[5] of Lone Pine's 154,000 barrels of oil production in the first quarter of 2011 (115,500 barrels) came from the Evi area. A-144 (Paradise Decl. Ex. A at 73). If Lone Pine incurred an additional $7 to $10 in transportation costs for each one of those barrels, then the increased transportation costs would have encompassed $808,500 to $1,155,000 of Lone Pine's reported expenses for the first quarter of 2011. But Lone Pine's total expenses for the first quarter of 2011 were $36,980,000. A-83 (Paradise Decl. Ex. A at 13); A-134 (Paradise Decl. Ex. A at 63). Thus, even if the increased transportation costs had affected Lone Pine's financial performance in the first quarter of 2011 (and they did not), the impact to Lone Pine's expenses would have been only 2.2% to 3.1%—a variation below the 5% presumptive materiality threshold. Moreover, because the Rainbow Pipeline disruption lasted only four months, the impact on

---

[5] This is the percentage of Lone Pine's estimated proved producing oil reserves (active oil producing reserves) that were located in the Evi area. A-71 (Paradise Decl. Ex. A at 2).

Lone Pine's expenses would amount to only less than .73% to 1.03% on an annualized basis.

### 4. Appellant overestimates the effect of the Rainbow Pipeline disruption on Lone Pine's revenues.

Appellant contends that Lone Pine's transportation costs were 7% to 10% of Lone Pine's oil revenues for the first quarter of 2011. Br. App't at 16. The materiality of these increased transportation costs cannot be assessed, however, by looking at oil revenues.[6] Rather, transportation costs should be compared to total revenues to determine whether the increased costs were material to Lone Pine. *See supra* Part II.A.2. Lone Pine's revenues for the first quarter of 2011 were $36,273,000. A-83 (Paradise Decl. Ex. A at 13–14); A-134 (Paradise Decl. Ex. A at 63). As noted above, if Lone Pine had incurred an additional $7 to $10 in transportation costs for each barrel of oil sold from the Evi area in the first quarter of 2011, then the increased transportation costs would have been $808,500 to $1,155,000—*i.e.*, 2.2% to 3.2% of Lone Pine's revenue for the first quarter of 2011, percentages well below the presumptive materiality threshold of 5%. And because the Rainbow Pipeline disruption lasted only four months, the impact on Lone Pine's revenue would be only .73% to 1.07% on an annualized basis.

---

[6] For the same reason, Appellant errs in comparing Lone Pine's oil transportation costs to Lone Pine's realized oil prices. Br. App't at 16.

23

Appellant also alleges that the pipeline disruption reduced what Lone Pine's revenues purportedly could have been by 3% to 5% for the second quarter of 2011. Br. App't at 16; A-36 (¶¶ 78-81). But this calculation is inflated because it erroneously assumes that the Rainbow Pipeline disruption increased transportation costs for every barrel of oil Lone Pine produced during the entire second quarter of 2011. The pipeline disruption could have impacted only two-thirds of Lone Pine's second quarter 2011 financials because the disruption began at the end of April (one third of the way through the second quarter). A-28-29 (¶¶ 43–44). Once Plaintiff's numbers are reduced by a third to correct for this, the potential impact of the pipeline disruption on revenue for the second quarter of 2011 as alleged by Plaintiff is reduced to 2% to 3.3%.

Even if one assumes that Lone Pine would have anticipated the increased amount of its revenue that came from oil in the second quarter (recognizing that transportation costs are recorded as a cost of revenue and therefore increase alongside revenue), the potential maximum impact of the pipeline disruption would have been anticipated to be 2.55%. In the second quarter of 2011, Lone Pine produced approximately 2,846 barrels of oil per day. A-37 (¶ 77). The pipeline disruption could be expected to reduce the price received for 75% of Lone Pine's oil (the percentage of Lone Pine's producing reserves located in the Evi area) by $10 per barrel (or less) for 63 days in that quarter. *See* A-71 (Paradise Decl. Ex. A

24

at 2); A-28–29 (¶¶ 43-44). This means that—at most—the pipeline disruption actually reduced second quarter 2011 revenue by $1,344,735 or 2.55% of what it might have been, again well below the presumptive materiality threshold.

For the third quarter of 2011, Plaintiff again incorrectly assumes that every barrel of oil Lone Pine produced incurred additional costs. *See* A-38 (¶ 86), A–39 (¶¶ 92-95). Even with that overestimation of the impact of the pipeline disruption, Plaintiff alleges only a maximum 3% to 4% impact on revenue for that quarter. A-39 (¶ 95).

Accordingly, the Amended Complaint does not include any allegation that the pipeline disruption had a material impact on revenue. Disclosure of the Rainbow Pipeline disruption would not have altered any of Lone Pine's reported financial metrics by more than 5%, and therefore such a disclosure is presumptively immaterial under the quantitative materiality factor. *ECA*, 553 F.3d at 204.

## B.    The <u>Qualitative</u> Materiality Factor Likewise Shows That the Rainbow Pipeline Disruption Was Not Material.

To plead qualitative materiality, Appellant must specifically identify qualitative factors demonstrating "a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available." *Hutchison,* 647 F.3d at 485 (emphases added) (citation omitted). Appellant argues that the

25

Rainbow Pipeline disruption was qualitatively material based on three factors listed in SAB No. 99:

1. "Whether the misstatement masks a change in earnings or other trends";

2. "Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate";

3. "Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."

SAB No. 99 at 45, 152; *see also* Br. App't at 15–20.

> ### 1.  The only notable "trends" following the Rainbow Pipeline disruption are <u>increases</u> to Lone Pine's revenues, oil production, and stock price.

Appellant alleges that, by not referring to the Rainbow Pipeline disruption in the Prospectus, Lone Pine "hid[] a change in earnings or other trends" because "investors were unaware that [Lone Pine's] trends and earnings [would be] disrupted" by the pipeline being taken offline. Br. App't at 18–19. Appellant also alleges that the Rainbow Pipeline disruption caused Lone Pine to face "the prospect of either shutting down oil production, continuing to pump oil at full or reduced capacity and storing the oil, or paying major increases in transportation costs to truck the oil to market." *Id.* at 5 (internal quotation marks and citation omitted).

But as the Amended Complaint concedes, following the IPO, all of Lone Pine's financial measures reported pursuant to SEC regulations improved—Lone Pine increased its average realized oil price, the volume of its oil production, and its revenues. A-35 (¶¶ 63, 73, 76); A-36 (¶¶ 77–78). While Appellant cites a newspaper article stating that unidentified "producers" faced the possibility of "shutting down" production A-30 (¶ 49), it is undisputed that Lone Pine's oil production *increased* following the Rainbow Pipeline disruption and the IPO. A-354 (Paradise Decl. Ex. H at 5).

Moreover, Lone Pine's stock *increased in value* by one cent the day after Lone Pine disclosed the pipeline disruption and its impact on the prices Lone Pine received for its Evi area production. A-374 (Paradise Decl. Ex. J). The Amended Complaint does not plead that any analyst reports focused on the pipeline disruption, and the conference call transcript quoted in the Amended Complaint reveals no questions to management about the pipeline disruption. A-364-71 (Paradise Decl. Ex. I). That Lone Pine's stock price *increased* upon disclosure of the Rainbow Pipeline disruption further shows that investors did not view the disruption to be material information.

Appellant may point out that, after the increase in Lone Pine's stock price on August 2, 2011, Lone Pine's stock price subsequently decreased between August 2, 2011 and August 11, 2011. But the Amended Complaint is devoid of any facts

27

that would justify concluding that an efficient market like the NYSE, where Lone Pine's stock trades, would require several days to incorporate new information. Nor does Plaintiff acknowledge that there were two other Lone Pine SEC filings in that nine-day span, ER 66-11 & 66-12 (Paradise Decl. Exs. K & L), as well as a dramatic decrease in the market generally following the announcement that Standard & Poor's had downgraded the United States Government's credit rating. *See* ER-66-13 (Paradise Decl. Ex. M).

### 2. The effect of the Rainbow Pipeline disruption on Lone Pine was not capable of precise measurement.

Appellant alleges the impact of the Rainbow Pipeline disruption was "capable of precise measurement" (Br. App't at 17), but as the District Court observed, the Amended Complaint "does not allege what Lone Pine reasonably should have expected the impact of the pipeline disruption would be at the time of its IPO." SPA-9 (Order at 9). Indeed, Appellant acknowledges that at the time of the IPO Lone Pine did not know, with precision, how many days the disruption would last. *Id.* The District Court correctly ruled that the Amended Complaint contains no facts from which one "can infer that at the time of the IPO, Lone Pine should have expected an extended disruption and a material impact on sales, revenue or income." SPA-9 (Order at 9). The law does not require Lone Pine to speculate about the effect that the Rainbow Pipeline disruption might have on Lone Pine's financial performance. *In re Par Pharmaceutical, Inc. Secs. Litig.*, 733 F.

28

Supp. 668, 678 (S.D.N.Y. 1990) ("Defendants cannot be held liable for failing to 'disclose' what would have been pure speculation.") (citations omitted).

### 3. The Rainbow Pipeline disruption only impacted one segment of Lone Pine's business.

Finally, Appellant argues that the Rainbow Pipeline disruption was qualitatively material because, according to Appellant, (1) the disruption affected the Evi area, and (2) the Evi area was "importan[t]" to Lone Pine's business. Br. App't at 19.

But Lone Pine did not break out in the Prospectus its oil production, or the Evi area, as a separate business segment from its natural gas production. This distinguishes the instant case from *Litwin v. Blackstone Group, L.P.*, where the Second Circuit found statistically insignificant omissions concerning losses on investments could be material because the defendant allegedly trumpeted in its offering documents that the business that suffered the losses was its "flagship segment." 634 F.3d 706, 720 (2d Cir. 2011). Moreover, even if the Evi area were treated as a stand-alone segment, Lone Pine did not suffer a loss of production (its production in fact increased), and it was not prevented from selling any oil (its sales revenues also increased), from the Evi area.

29

## III. Appellant Did Not Sufficiently Allege That Lone Pine Had a Legal Duty To Disclose the Rainbow Pipeline Disruption.

### A. Item 303 of Regulation S-K Did Not Require Lone Pine To Disclose the Rainbow Pipeline Disruption.

Appellant erroneously contends that the pipeline disruption had to be disclosed pursuant to Item 303(a)(3)(ii) of SEC Regulation S-K. Both parties agree that Item 303(a)(3)(ii) only requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant *reasonably expects* will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. 229.303(a)(3)(ii) (emphasis added). This Court has relied on the SEC's interpretive release regarding this provision, which "clarifies that the Regulation imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Hutchison,* 647 F.3d at 485 (citations omitted). Appellant has not pleaded facts demonstrating the existence of these predicates, and therefore the District Court correctly determined that a legal duty to disclose the pipeline disruption did not exist. SPA-6-9 (Order at 6-9).

First, whether the Rainbow Pipeline would reopen was not a "known uncertainty." Part of the pipeline had reopened before the IPO, and the entire pipeline was completely reopened just four months later. Appellant attempts to

minimize that within days of the disruption, the ERCB had approved resumption of partial operation of the pipeline. Br. App't at 25. Contrary to Appellant's assertion, Plains, the Rainbow Pipeline's owner, had reported that the disruption was a singular failure and not a systemic problem. See ER-66-4 (Paradise Decl. Ex. D at 76); ER-66-6 (Paradise Decl. Ex. F). Furthermore, another pipeline in the same area had ruptured two weeks before the Rainbow Pipeline and was back in service within a week. A-30 (¶ 47). These facts undercut any assertion that a "known uncertainty" existed sufficient to create a duty of disclosure under SEC Regulation S-K Item 303(a)(3)(ii).

Second, as discussed in Part II.A.4, *supra*, Appellant has not pleaded facts sufficient to show that the pipeline disruption had a material impact on Lone Pine's "revenues." Indeed, Lone Pine's revenue increased 41% from the first quarter to the second quarter of 2011. A-361 (Paradise Decl. Ex. H at 12).

Appellant's reliance on *Litwin*, 634 F.3d 706 is misplaced. The plaintiffs in *Litwin*, alleged, *inter alia*, that Blackstone was aware that certain of its portfolio companies and real estate fund investments were experiencing problems. *Id.* at 710. This Court held that the *Litwin* plaintiffs had sufficiently pleaded that Blackstone knew, and reasonably expected, that certain fees would be clawed back, which would materially affect future revenues. *Id.* (emphasis added). Here, by contrast, there are no well-pleaded facts that suggest Lone Pine should have

31

reasonably expected that the pipeline disruption would materially impact its revenues.

Appellant's reliance on *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114 (2d Cir. 2012), is similarly misplaced. In *Panther Partners*, the defendants allegedly failed to disclose that at the time of its secondary offering of securities, the issuer, a manufacturer of semiconductor chips, had been suffering a catastrophic failure rate in chips it sold to its two largest customers who accounted for 72% of the issuer's prior year's revenues. *Id.* at 121. Based on these facts, this Court held that plaintiffs had plausibly alleged that the potential impact of this defect issue constituted a known trend or uncertainty that defendants reasonably expected would have a material adverse impact on revenues or income. *Id.* Unlike the plaintiffs in *Panther Partners*, Appellant's allegations are devoid of any facts to show that Lone Pine reasonably expected that the increased transportation costs due to the temporary pipeline disruption would have any, let alone a material, ongoing impact on Lone Pine's revenues or income.

The First Circuit's decision in *Silverstrand Investments v. AMAG Pharmaceuticals, Inc.*, 707 F.3d 95 (1st Cir. 2013), also fails to support Appellant's argument. In *Silverstrand*, the defendants allegedly failed to disclose that at the time of the offering, the issuer, a pharmaceutical company, had received 23 serious adverse event reports ("SAEs") and notice of a death related to

32

Feraheme, "a make-or-break drug for [defendant's] future." *Id.* at 97. The analysis in *Silverstrand* drew from *Panther Partners*, and noted that in the context of Item 303 disclosure obligations, the issue is the "manner in which uncertainty surrounding [the event] might reasonably be expected to have a material impact on future revenues." *Id.* at 106 (citations omitted). As a result, the *Silverstrand* Court focused on the fact that the defendant reasonably knew that the uncertainties generated by the SAEs would adversely affect future revenues. *Id.* As the District Court held here, "the Amended Complaint alleges no facts from which [that] Court c[ould] infer that Lone Pine should have expected a material impact on sales, revenue, or income at the time of the IPO." SPA-10 (Order at 10).

### B. Lone Pine's Statements About Its Own Infrastructure and Transportation Costs Did Not Obligate Lone Pine To Make Disclosures About a Pipeline Owned and Operated by a Third Party.

Appellant claims that Lone Pine had an affirmative legal duty to mention the Rainbow Pipeline disclosure in the Prospectus because Lone Pine stated: "[W]e [Lone Pine] have installed infrastructure that allows us to transport by pipeline the majority of our oil production, which has minimized the cost of trucking and the downtime associated with weather-dependent access to some locations." Br. App't at 27–31. Appellant argues that this statement by Lone Pine is misleading without reference to the Rainbow Pipeline disruption because, according to Appellant's

33

argument, some of Lone Pine's "infrastructure"—the Rainbow Pipeline—was out of commission when the Prospectus was issued. *Id.*

Appellant is misreading the plain language of Lone Pine's disclosure. *See In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) ("[W]e presume that a reasonable investor can comprehend the basic meaning of plain-English disclosures and will not credit Plaintiffs' [erroneous] reading [of the disclosure].""). The quoted disclosure refers to the infrastructure of *Lone Pine*—*i.e.*, the pipeline infrastructure that "we [Lone Pine] have installed." The Prospectus discloses that Lone Pine holds 41,000 net acres of land (about 64 square miles, almost three times the size of Manhattan) in and near the Evi field that are split into 64 sections and on which Lone Pine had (at the time of the IPO) 55 producing wells. A-169 (Paradise Decl. Ex. A at 98). The quoted disclosure is referring to *Lone Pine's* infrastructure used to gather and accumulate the oil Lone Pine produces in the Evi area from those 55 locations and transport it to central gathering points, and ultimately to a sales point, such as Plains' Rainbow Pipeline. There are no facts pled to show that Lone Pine's own infrastructure was ever out of use or encumbered in any way prior to the issuance of the Prospectus.

The Rainbow Pipeline, which was out of service at the time of the IPO, is an entirely separate transportation infrastructure owned and operated by a third party, Plains. The Rainbow Pipeline is not the subject of the disclosure that Appellant

34

quotes. The Rainbow Pipeline could have been shut down completely and the quoted statement about Lone Pine's infrastructure would have been accurate because Lone Pine would still have been able to use its own infrastructure to move the production through the field. The quoted statement about Lone Pine's transportation infrastructure was neither false nor misleading; Appellant is just misreading the disclosure to say something that is not there.

None of Plaintiff's cases suggest that Lone Pine's statement about its own infrastructure imposed a duty also to make disclosures about Plains' infrastructure, the Rainbow Pipeline. Plaintiff cites *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002), where this Court held that "[o]nce Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete." Br. App't at 29. Plaintiff also relies on *Shapiro v. UJB Finance Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), for the proposition that, "[b]y addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." Br. App't at 29–30. But neither *Caiola* nor *Shapiro* can be read to suggest that a defendant's statements about its *own* strategy/practice obligates the defendant to make disclosures about *other companies'* strategies/practices.

Plaintiff also relies on *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120 (2d Cir. 2011). Br. App't at 27. In *Wilson*, the Court discussed the standards for disclosure,

35

stating that (1) "literally true statements [can] create a materially misleading impression," but acknowledging that (2) "there are limitations on what securities market participants are required to disclose," and ultimately holding that (3) the defendant must disclose "material objective factual matters." *Wilson*, 671 F.3d at 130-31 (internal quotations and citations omitted); *see also McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (stating that the disclosure must "accurately inform rather than mislead prospective buyers") (cited at Br. App't at 27). Lone Pine did exactly what *Wilson* instructs—Lone Pine disclosed the objective factual matter that the transportation infrastructure installed by Lone Pine was more economical than trucking.

Finally, Plaintiff cites *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), where Sprint allegedly forced the defendant, a Sprint affiliate, to restructure its enterprise by ceding control of its billing and customer service operations to Sprint and participating in ill-conceived programs to serve bad-credit customers. *Id.* at 232–36. The defendant allegedly knew that these Sprint-imposed changes "would be disastrous for the company" and "would cause our business plan to fail." *Id.* at 234–35. But in disclosing these structural changes, the company disclosed only positives and never disclosed the allegedly known disastrous consequences that the changes would bring. The court concluded that the disclosed positive information about the changes was misleading because the disclosure

36

omitted the severe negative consequences that management knew the changes would bring. *Id.* at 249–50.

Here, by contrast, there are no facts pled to show that anyone at Lone Pine believed the Rainbow Pipeline situation would cause anything other than a short-term increase in a single expense item in only a segment of Lone Pine's business. As the District Court found:

- "[A]t the time of the IPO," the "Rainbow Pipeline had already been repaired" and "another recent pipeline outage nearby had lasted only a week."

- Appellant "does not allege that Lone Pine knew whether or how the pipeline disruption might affect its quarterly results at the time of its May 26, 2011 IPO."

- Appellant "alleges no facts from which this Court can infer that Lone Pine should have expected a material impact on sales, revenue, or income at the time of the IPO."

SPA-10 (Order at 10). As the Amended Complaint concedes, following the IPO all financial measures reported pursuant to SEC regulations improved—Lone Pine increased its average realized oil price, the volume of its oil production, and its revenues. A-35 (¶¶77-78); A-36 (¶¶ 77-78).[7]

---

[7] Appellant relies on *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*, 595 F.3d 86 (2d Cir. 2010) (Br. App't at 27), but that case is distinguishable. In *Operating Local*, a fund manager's contract with a transfer agent allegedly burdened the fund with excessive fees that were then kicked back to the fund manager's affiliate. *Id.* at 89. This Court held that the fund manager had a duty to disclose that the shareholders "were at the mercy of a faithless fiduciary"—*i.e.*, that "the expenses categorized as transfer agent fees were

Appellant complains that Lone Pine was obligated to reference the Rainbow Pipeline disruption given the Prospectus's statement of a "risk factor"—*i.e.*, the Prospectus's statement that "[i]f we experience interruptions or loss of pipelines or access to gathering systems that impact a substantial amount of our production, it could have a material adverse effect on our business, financial condition, cash flows, and results of operations." Br. App't at 30 (citing A-33-34 (¶ 66)). But, Appellant has not pleaded facts to establish that the pipeline disruption prevented Lone Pine from marketing any, much less a substantial amount, of its production. And there are no facts pleaded in the Complaint to show that at the time of the IPO, management believed it would be prevented from marketing any of its production. The Complaint concedes that Lone Pine's production increased during the second quarter of 2011, a period during which the Rainbow Pipeline was partially out of service. *See* A-36 (¶ 77).

---

not transfer agent fees at all and included kickbacks." *Id.* at 92–93. Here, by contrast, the Amended Complaint contains no allegations that the allegedly omitted information—the Rainbow Pipeline disruption—involved any breach of fiduciary duty.

## IV.   Appellant's Failure To Plead a Section 11 Claim Forecloses Any Claim Under Section 15.

The District Court correctly concluded that Appellant's failure to plead "a primary violation of the securities laws" defeats Appellant's claim under Section 15. SPA-10-11 (Order at 10–11).

## CONCLUSION

The District Court's judgment should be affirmed.

Dated: July 22, 2014

/s/ Peter E. Kazanoff
Peter E. Kazanoff
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
pkazanoff@stblaw.com

***Attorneys for Appellees J.P. Morgan
Securities LLC, Credit Suisse Securities
(USA) LLC and TD Securities (USA) LLC***

/s/ Steven Paradise
Clifford L. Thau
Steven R. Paradise
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
cthau@velaw.com
sparadise@velaw.com

***Attorneys for Defendants Lone
Pine Resources Inc., Forest Oil
Corporation, David M. Anderson,
Michael N. Kennedy, H. Craig
Clark, Patrick R. McDonald,
David M. Fitzpatrick, Loyola G.
Keough, and H. Clayton Peterson***

39

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32 because this brief contains 9,069 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point font.

/s/ Steven R. Paradise
Steven R. Paradise
*Attorney for Defendants Lone Pine Resources Inc., Forest Oil Corporation, David M. Anderson, Michael N. Kennedy, H. Craig Clark, Patrick R. McDonald, David M. Fitzpatrick, Loyola G. Keough, and H. Clayton Peterson*

Dated: July 22, 2014

40

## <u>CERTIFICATE OF SERVICE</u>

**CAPTION**: Adar Investment Fund, LTD., Todd Augenbaum, Individually and On Behalf of All Others Similarly Situated, Ralph Holl, individually and on behalf of all others similarly situated, Todd Augenbaum, Individually and On Behalf of All Others Similarly Situated v. Forest Oil Corporation, David M. Anderson, Michael N. Kennedy, H. Craig Clark, Patrick R. McDonald, Loyola G. Keough, David M. Fitzpatrick, H. Clayton Peterson, J.P. Morgan Securities LLC, Credit Suisse Securities (USA) LLC, TD Securities (USA) LLC, Lone Pine Resources, Inc.

**DOCKET NUMBER**: 14-1471

I, Steven R. Paradise, hereby certify under penalty of perjury that on July 22, 2014, I served a copy of the foregoing brief by CM/ECF on the following parties:

Stanley D. Bernstein
Michael S. Bigin
Joseph R. Seidman, Jr.
Bernstein Liebhard LLP
10 East 40th Street, 22nd Floor
New York, New York 10016
(212) 779-1414
bernstein@bernlieb.com
bigin@bernlieb.com
seidman@bernlieb.com
Counsel for Plaintiff-Appellant

/s/ Steven R. Paradise
Steven R. Paradise
*Attorney for Defendants Lone Pine Resources Inc., Forest Oil Corporation, David M. Anderson, Michael N. Kennedy, H. Craig Clark, Patrick R. McDonald, David M. Fitzpatrick, Loyola G. Keough, and H. Clayton Peterson*

Dated: July 22, 2014

41